Carol MOREAU, Appellant,

v.

STATE of Alaska, Appellee.

Davis STONE, Appellant,

v.

STATE of Alaska, Appellee.

No. 2355.

Supreme Court of Alaska.

Dec. 15, 1978.

Barbara J. Miracle, Sue Ellen Tatter, Asst. Public Defenders, and Brian Shortell, Public Defender, Anchorage, for appellant Moreau.

Phillip P. Weidner, Drathman, Weidner & Bryson, Anchorage, for appellant Stone.

Monica Jenicek, Asst. Dist. Atty., Joseph D. Balfe, Dist. Atty., Anchorage, and Av-

rum M. Gross, Atty. Gen., Juneau, for appellee.

## OPINION

Before BOOCHEVER, C. J. and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

BOOCHEVER, Chief Justice.

Davis Stone and Carol Moreau, convicted after a joint trial of possession of heroin,[1] bring separate appeals to this court, each raising numerous claims of error. We affirm Stone's conviction and remand for resentencing. Moreau's conviction is reversed.

On October 26, 1973, a grand jury returned an indictment for possession of heroin against Davis Stone, Case No. 73–637 Criminal. That same day, a bench warrant was issued for the arrest of Stone.[2]

The indictments in No. 73–637 Criminal and a companion case, that of Debbie Phelps, No. 73–636 Criminal, were based on evidence obtained from a search of the residence of David Bell in Anchorage. The search of that house, which exposed evidence implicating Stone and Phelps, was authorized by a warrant supported by two affidavits: one by C. R. McCoy, a state police investigator, dated October 17, 1973, and one by a confidential informant, John Brodigan, dated simply October 1973. Brodigan subsequently revised his affidavit on December 16, 1973.[3]

In order to serve a bench warrant for the arrest of Davis Stone, Investigator John R. Needham of the Metropolitan Narcotic Unit

1. AS 17.10.010 provides:

    *Acts prohibited.* It is unlawful for any person to manufacture, possess, have under his control, sell, prescribe, administer, dispense, give, barter, supply or distribute in any manner, or compound any narcotic drug except as authorized in this chapter.

2. In a hearing before Judge Occhipinti, an assistant district attorney requested a bench warrant which was granted. No reason for issuing a warrant, as opposed to a summons, appears in the record. The bench warrant issued was signed by a deputy clerk.

3. Subsequent to the revision of the Brodigan affidavit, Phelps successfully moved to suppress the evidence seized on the grounds that the affidavits as revised did not provide probable cause for the issuance of the search warrant. The motion was granted by Judge Kalamarides on February 4, 1974.

    Stone, on April 1, 1974, moved to dismiss the charges against him in No. 73–637 Criminal. The prosecutor admitted that all the evidence in the case had been previously suppressed and did not oppose the motion, which was granted.

of the Anchorage Police Department and Alaska State Trooper Daniel J. Goodwin, assigned to the Unit, knocked on the door of the Stone and Moreau residence around 3:00 p. m. on November 13, 1973. The record discloses no warrant for the arrest of Carol Moreau. They were dressed, in Goodwin's words, in "civilian clothes very casually." The door of the Stone and Moreau home was answered by Tiffany Powers. Ms. Powers asked the pair if they were from a local TV repair shop. Trooper Goodwin answered "yes." Ms. Powers left and returned to the door in less than a minute with Carol Moreau. When Goodwin asked for Stone, Moreau informed him that Stone was sleeping and that they should come back later.

There is a conflict in testimony as to the subsequent behavior of the officers. Goodwin testified that, at that point, he pulled his badge out of his pocket and displayed it. The door was partially slammed in his face, and he pushed it open, entering the house yelling "troopers" or "state police." Investigator Needham corroborated this testimony and noted that the force of the entry knocked Ms. Moreau over a table. Trooper Goodwin drew his gun upon entering the house. Moreau testified at the suppression hearing that the two men did not identify themselves and that, because their behavior frightened her, she attempted to obstruct their entry into her home.[4] Both officers testified that they rushed through the house until they reached the back bedroom. In the bedroom, the officers found Stone, nude, standing at the foot of the bed.

The evidence which formed the basis for the heroin possession charges against Stone and Moreau was a wet and wadded napkin which, according to the officers' testimony, Stone spit out of his mouth at the officers' command and which Moreau picked up. She may have made a movement toward

the bathroom, the officer grabbed her and took the napkin. The damp napkin, which one officer believed contained a "brown residue," was subsequently determined to contain three to four percent heroin. It formed the basis for the indictment for possession in No. 73–765 Criminal, the instant case.[5]

In preliminary proceedings, Stone moved to quash the arrest warrant, alleging that it was void because it was not signed by a judge or magistrate but by a deputy clerk. It was noted that the arresting officers allegedly found the heroin when Stone was searched incident to arrest.

Both Stone and Moreau moved to suppress "certain evidence" as the fruit of an illegal search and seizure. In documents filed in support of this motion, the invalidity of the arrest warrant was alleged, without elaboration. In addition, it was alleged that the search of the defendants' premises exceeded the scope of permissible search incident to arrest. In a hearing on the motion to suppress, defense counsel stated that he was not at that time seeking to suppress the napkin, which formed the basis for the present conviction. The trial judge, as a basis for determining credibility of the witnesses at the hearing, permitted questioning as to whether Moreau was a prostitute and a drug addict and as to the illegality of Stone's earnings.[6] The judge stated that he believed the defendants to be "leeches on society" and found their testimony to lack credibility. The motion to quash the warrant was denied; the suppression motion was granted in part.

At the trial, Stone was the only witness for the defense. He testified that he had never seen the napkin, that he did not know what heroin was, nor did he know people who dealt in or used heroin.

4. Moreau testified to screaming for Stone in her fright. Needham testified that Moreau shouted something to the effect of "Stone, it's the cops."

5. Stone was arrested at that time on the basis of the bench warrant and Moreau was charged with interfering with a police officer, a charge

which was later dropped. It was not until the next month that the appellants were informed that they were charged with possession of heroin arising out of the November 13th incident.

6. The questions were answered in the negative.

On the second day of trial, the defense moved to dismiss the indictment as to appellant Moreau, on the ground that she had had no knowing possession and as to both defendants, on the ground that the residue of heroin on the napkin was unusable and thus not sufficient to sustain a conviction. The motions were denied. The jury returned a verdict of guilty for both defendants. Moreau was sentenced to a term of eight years; and Stone, to six years.

## I. SUPPRESSION OF THE NAPKIN

### A. Revision of the Affidavit.

Both appellants argue that the napkin should not have been admitted into evidence. They contend that the revision of the Brodigan affidavit destroys probable cause supporting the Bell search warrant. Thus, they submit, the indictment against Stone was invalid, rendering the arrest warrant and entry into the Stone and Moreau residence illegal. Therefore, the napkin should have been suppressed.

■ Although this issue was extensively briefed, it has not been shown where the issue was properly presented to the trial court. The defense motions to quash the arrest warrant and to suppress other evidence did not rely on this ground. The only

direct reference to a nexus between the Bell search and the napkin was by the prosecutor, when requesting a continuance:

> The Stone/Moreau possession . . . that could be interrelated back and it may be a traceable poison fruit problem possibly back to the Phelps—leading as far back as the Phelps situation.[7] I'm simply not prepared to address myself to the necessity to dismiss certain counts or cases and I must ask the court for additional time . . ..

The defense agreed to the continuance and never introduced the connection between the Bell search warrant and Stone's bench warrant as grounds for excluding the heroin-tinged napkin. Thus, we examine this issue in the context of plain error.[8]

■ It is clear that a false affidavit in support of a search warrant can, in appropriate circumstances, nullify the warrant. *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).[9] Since defendant's counsel did not question the affidavit at trial or pre-trial motions, the contours of the plain error rule shape our inquiry into whether admission of the heroin-tinged napkin requires reversal.[10]

In *Dimmick v. State*, 449 P.2d 774, 776 (Alaska 1969), we referred to the plain error doctrine as a device "to prevent a miscar-

---

**7.** Phelps, as mentioned earlier, was indicted as a result of the Bell search.

**8.** Criminal Rule 47(b) provides:
   (b) *Plain Error.* Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

**9.** *See United States v. Belculfine*, 508 F.2d 58 (1st Cir. 1974); *Lockridge v. Superior Court*, 275 Cal.App.2d 612, 80 Cal.Rptr. 223, 230–32 (1969); *cf. Theodor v. Superior Court*, 8 Cal.3d 77, 104 Cal.Rptr. 226, 234–245, 501 P.2d 234, 243–53 (1972) (statute allows defendant to controvert truth of facts in affidavit). The full impact of *Franks v. Delaware* on federal constitutional law in the area of false affidavits remains to be seen. In *People v. Cook*, 22 Cal.3d 67, 148 Cal. 605, 583 P.2d 130 (1978), the California Supreme Court found that California's constitution requires greater protection than the federal constitution. *Cook* permits challenge of an affidavit when the misstatements

are negligent, *Franks* requires an intentional or reckless misstatement; *Cook* quashes the warrant entirely once misstatements are shown, *Franks* deletes the false information and tests the remaining information for probable cause. *Id.* 148 Cal.Rptr. at 615–617, 583 P.2d at 140–42. Since we do not find that the misstatement in the warrant in the instant case was plain error, we do not analyze *Franks* and whether Alaska's Constitution goes beyond *Franks*.

**10.** Criminal Rule 26(g) specifies that illegally obtained evidence shall not be used for any purpose. The provisions of the rule, however, may be waived if the defendant does not object to the evidence and thereby fails to obtain a determination from the trial court on whether admission of the evidence violated Criminal Rule 26(g). If, as here, defense counsel makes no objection, we then evaluate whether admission of the allegedly illegal evidence constitutes plain error.

riage of justice"[11] and noted the following purposes underpinning the requirement that points of appeal be preserved at trial:

> The main purpose of the rule is to require errors to be drawn to the attention of the trial court in time for their correction so as to avoid the inconvenience and expense of a new trial. Another reason is to obviate the temptation to save defenses for the purpose of obtaining a new trial on appeal.

*Id.* (footnote omitted).

Here, if proper objection had been raised to the admission of the heroin-tinged napkin, the trial court would have been confronted with issues involving the original search of the Bell apartment. First, the court would have had to decide whether Judge Kalamarides' decision in Case No. 73–637 to suppress the evidence seized as a result of the Bell search was binding on the state in this case, No. 73–635, under the doctrine of collateral estoppel.[12] If the court found the decision in the earlier case did not bind the state, the court would have then made an independent determination of whether the alteration in Brodigan's affidavit required suppression of the evidence obtained as a result of the search of Bell's apartment.

Furthermore, in *Randall v. State*, 583 P.2d 196, 200 (Alaska 1978), we stated:

> An appellant raising an error as plain error on appeal "must shoulder the heavy burden of demonstrating that the alleged misconduct raises a substantial and important question." *Garroutte v. State*,

508 P.2d 1190, 1191 (Alaska 1973). Furthermore, such error must be "obviously prejudicial." *Bowker v. State*, 373 P.2d 500, 505 (Alaska 1962); *Kugzruk v. State*, 436 P.2d 962, 964 (Alaska 1968).

> "Where the misconduct fails to rise to the level of plain error, considerations of judicial economy dictate that we deal with the matter summarily."

*Garroutte v. State, supra,* at 1191.

▮ Applying these concepts to the search and seizure issue presented here, we do not find plain error. While we do not state that search and seizure issues are incapable of plain error analysis,[13] we believe that the exclusionary rule which requires the suppression of illegally obtained evidence is usually not appropriately raised for the first time on appeal. This view finds support from prior Alaska decisions[14] and with decisions in other jurisdictions.[15]

▮ The exclusionary rule is not the type of doctrine designed to protect against conviction of the innocent. Rather, it is a prophylactic device to curb improper police conduct and to protect the integrity of the judicial process. Thus, justice does not generally require that it be applied on appeal where it is not urged at trial or where new grounds for its invocation are presented on appeal.

B. "Knock and Announce" Statute.

▮ Both defendants argue that the failure of the arresting officers to announce

---

**11.** *Accord, Hammonds v. State*, 442 P.2d 39, 43 (Alaska 1968):

> The meaning of Crim.R. 47(b) is that we may consider questions raised for the first time on appeal if necessary to effect substantial justice or prevent the denial of fundamental rights.

**12.** See discussion of this issue in the context of a civil case in *Pennington v. Snow*, 471 P.2d 370 (Alaska 1970).

**13.** Singularly egregious violations might be considered for the first time on appeal.

**14.** *Cf. Rank v. State,* 373 P.2d 734, 737 (Alaska 1962) (plain error rule only appropriate to prevent a manifest miscarriage of justice).

**15.** *See, e. g., Johnson v. State*, 562 P.2d 1294, 1298 (Wyo.1977) (generally, claim of illegal search and seizure will not be considered on appeal if no prior objection); *State v. Gant*, 6 Wash.App. 263, 492 P.2d 571, 573 (1971) (defendant's failure to move for suppression of evidence means issue was not preserved for appeal); *cf. People v. Allen*, 568 P.2d 57, 57–58 (Colo.1977) (objection to lack of *Miranda* warnings does not show plain error). These cases do not articulate rules about what is plain error. They do, however, reflect the general practice of many appellate courts to refuse to find plain error when the evidence is excludable for violation of prophylactic rules imposed to curb police conduct.

their identity and purpose before entering Stone and Moreau's house violated the state "knock and announce" statute, which provides:

> *Breaking into building or vessel to effect arrest.* A peace officer may break into a building or vessel in which the person to be arrested is or is believed to be, if the officer is refused admittance after he has announced his authority and purpose.[16]

While this apparent violation of the statute presents a serious claim of error, the issue was not presented to the trial court. In view of the considerations set forth in the previous section of the opinion about claims of plain error based on the exclusionary rule, we do not find plain error in the officers' failure to comply with the knock and announce statute.[17]

## II. VALIDITY OF THE ARREST WARRANT

### A. Issuance of Warrant, as Opposed to a Summons.

Both defendants claim that the failure of the court to make a finding of the necessity of issuing a bench warrant in No. 73–637 Criminal, as opposed to a summons, constitutes a violation of Alaska's Criminal Rules.

Criminal Rule 9(a) provides in pertinent part:

> *Issuance.* Upon the return of the indictment or filing of the information the court shall issue a warrant of arrest for each defendant named in the information, if it is supported by oath, or in the indictment, except that no warrant should be issued for any defendant who has theretofore been held to answer for the offense or offenses charged or who is

on bail or recognizance for that offense or offenses, *and in other cases no warrant should be issued unless the court has reason to believe that the defendant will not appear in response to a summons.* The clerk shall issue a summons instead of a warrant upon the request of the prosecuting attorney, or by direction of the court. . . . If a defendant fails to appear in response to the summons, a warrant shall issue. [emphasis added]

█ It is fundamental that the judge or magistrate issuing a warrant cannot serve as a rubber stamp for police decisions on choice of arrest. *Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723, 726–27 (1964). A "detached scrutiny" is required. *Katz v. United States,* 389 U.S. 347, 356, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967).[18]

The record in this case reveals that the bench warrant was issued under an order of Judge Occhipinti at the request of the Assistant District Attorney. No mention is made on the record for any reason for seeking a warrant as opposed to a summons.

█ Criminal Rule 9(a) does not require that the trial court articulate a reason for the issuance of a bench warrant. We thus do not find the lack of such reasoning in the record to be error.[19]

### B. Signature of Deputy Clerk.

█ Stone additionally argues that the fact that the bench warrant was not signed by a magistrate or a clerk, but by a deputy clerk, renders it invalid. While warrants or summons issued on a complaint or affidavit must be signed by the magistrate under Criminal Rule 4(b)(1), Criminal Rule 9(b)(1) states that a warrant or summons issued on

---

**16.** AS 12.25.100. *Accord,* 18 U.S.C. § 3109. For analysis of knock and announce statutes, see *Miller v. United States,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958) (evidence excluded for lack of compliance); *Davis v. State,* 525 P.2d 541 (Alaska 1974) (evidence admitted).

**17.** *See State v. Johnson,* 253 Or. 416, 454 P.2d 852 (1969) (per curiam); *State v. Hollman,* 251 Or. 416, 446 P.2d 117, 119–20 (1968).

**18.** *See also* Frankel, *Bench Warrants Upon the Prosecutor's Demand: A View from the Bench,* 71 Colum.L.Rev. 403, 413 (1971).

**19.** We have referred the matter to the Advisory Committee on Criminal Rules for its consideration on the question of whether the judge should set forth reasons for issuing a warrant.

an indictment must only be signed by the clerk. Stone's arrest was based on an indictment and thus, a magistrate's authorization was not necessary.

The fact that the warrant was signed by a deputy clerk does not impair its validity since the rule provides for signing by the clerk, and AS 22.20.035 states:

> *Powers of judicial employees.* The clerk of a court, and a deputy clerk designated by order of a court, may exercise the powers of judicial officers specified in § 30(4), (5), (6) and (7) of this chapter, *and other powers authorized by law.* [emphasis added]

We find no irregularity in the issuance of the bench warrant.

## III. BIAS OF TRIAL JUDGE

Both defendants claim a denial of due process and equal protection in the fact that the judge at the suppression hearing considered unverified allegations of misconduct and allegedly used them to impeach the defendants' credibility.

At the hearing, the judge allowed cross-examination of the defendants on whether Moreau worked as a prostitute and whether she used drugs and on Stone's alleged illegal earnings.

Assuming that permitting this questioning was error,[20] we find it harmless error. The defendants were convicted for possession of heroin. At this hearing, defense counsel was not requesting suppression of the napkin. The napkin, along with the officers' testimony about what happened after they entered the apartment, was the basis for the defendants' convictions.[21]

It is further contended that the judge evinced a bias against the defendants, preventing a fair trial. Aside from remarks made during the suppression hearing, the briefs fail to present any conduct during trial which could be considered as evidencing bias. We find no indication of bias which could have affected the jury's verdict.

## IV. FAILURE TO POLL JURY

Both defendants argue that it was reversible error for the trial judge, upon a request that the jury be polled, to fail to poll each juror as to the verdict against *each* defendant. All jurors testified that the guilty verdict was their decision with respect to both defendants.

Criminal Rule 31(d) states:

> When the verdict is returned and before it is recorded the jury shall be polled at the request of any party or upon the court's own motion. If, upon the poll, there is not unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged.

The appellants claim that denial of such a fundamental right requires retrial, although there was no objection made at the time of the verdict.

There is nothing in the record to indicate that the jury did not consider the case against each defendant individually. The failure to poll the jury as to each defendant, when such a poll was not requested and the record suggests no jury confusion or failure to consider each defendant, is not reversible error.[22] We do, however, believe that the better practice for the trial judge is to poll the jury as to their verdict about each defendant.

## V. CONFLICT BETWEEN DEFENDANTS

Appellants argue that the court erred in failing to make an affirmative on-the-rec-

---

**20.** At trial, evidence of a witness's drug use or addiction is not admissible to prove general unreliability. *Morrell v. State,* 575 P.2d 1200, 1204 (Alaska 1978); *Fields v. State,* 487 P.2d 831, 844 (Alaska 1971). The same rule applies to evidence that the witnesses were "persons of bad moral habits." *Jones v. State,* 576 P.2d 997, 1001 (Alaska 1978).

**21.** We note that the case was tried to a jury which did not hear the challenged evidence.

**22.** Cf. *Holiday Inns of America v. Peck,* 520 P.2d 87, 90–92 (Alaska 1974) (submission of compound, arguably erroneous interrogatories to civil jury not plain error since it was highly unlikely jury followed erroneous theory).

ord determination that both defendants had made an intelligent choice to be represented by the same attorney, and in failing to investigate the potential conflict. In the District of Columbia and the First Circuit, the trial judge must make such an independent investigation of defendants.[23] As the state notes, however, other federal circuits have decided not to adopt this rule,[24] finding that the primary responsibility for ascertaining and avoiding conflict situations lies properly with members of the bar.[25]

Moreau claims that the judge failed to insure that she understood the conflicts involved or the alternatives available to her and compounded the error by saying the conflict occurred only where one defendant accused the other of being the guilty party. She argues that, since she was misinformed as to the meaning of a conflict, she could not have intelligently decided that she needed separate counsel.

▆ In the present case, we find that the judge did adequately advise the defendants. This exchange occurred:

> THE COURT: I want Mr. Stone and Miss Moreau to understand thoroughly here that if you think there is a conflict— in other words if we go on without another attorney here to protect your individual interests, you are doing so at your risk not the court's or the state, do you understand that? And you are free to get another attorney. Mr. Horton indicates that there may come a situation where you, Mr. Stone, your interest may be contrary to Miss Moreau's interests and your attorney's going to have to argue against the other, do you understand that part of it? And I don't want that to happen in the middle of a trial when you don't have, you know, a fair chance to defend yourselves against each other if that's necessary. So, if you wish we can continue with the selection of the jury and probably—I'll give you another day to find out if Mr. Howard or some other attorney's coming up.
>
> MR. HORTON: Fine.
>
> THE COURT: But I'm going to hand— it's your choice now. I'll go on if you say okay.
>
> MR. HORTON: I believe that they're of—they have expressed to me the opinion they would like to proceed, Your Honor.

We find this examination was sufficient to constitute a voluntary waiver of the right to individual counsel in this case.

We do, however, recognize the dangers of joint representation to a defendant's right to counsel protected under both the United States and Alaska Constitutions.[26]

**23.** *United States v. Foster,* 469 F.2d 1, 4–5 (1st Cir. 1972); *Campbell v. United States,* 122 U.S. App.D.C. 143, 352 F.2d 359 (1965).

In *United States ex rel. Hart v. Davenport,* 478 F.2d 203 (3d Cir. 1973), the court indicated that affirmative judicial inquiry might be desirable, *id.* at 211, but invalidated a conviction resulting from joint representation on the basis of prior Third Circuit case law, finding that the defendant had shown a "possible conflict of interest or prejudice, however remote," *id.* at 210. In *Fryar v. United States,* 404 F.2d 1071 (10th Cir. 1968), *cert. denied,* 395 U.S. 964, 89 S.Ct. 2109, 23 L.Ed.2d 751 (1969), the court implied that prejudice would usually result from joint representation but found "the case at bar to be an exception for our review of the record indicates that the defense of the *Fryars* was completely without conflict and without a semblance of prejudice to either." *Id.* at 1073.

**24.** *United States v. Mandell,* 525 F.2d 671, 674–78 (7th Cir. 1975), *cert. denied,* 423 U.S. 1049, 96 S.Ct. 774, 46 L.Ed.2d 637 (1976); *United States v. Christopher,* 488 F.2d 849, 851 (9th Cir. 1973); *United States v. Paz-Sierra,* 367 F.2d 930, 932–33 (2d Cir. 1966), *cert. denied,* 386 U.S. 935, 87 S.Ct. 962, 17 L.Ed.2d 807 (1967). The Seventh Circuit has modified its position in *Mandell,* holding in a subsequent case that: "[w]hen an actual conflict appears, the court must bring the fact of its existence and the resulting dangers which are reasonably foreseeable to the attention of each affected defendant . . . ." *United States v. Gaines,* 529 F.2d 1038, 1044 (7th Cir. 1976).

**25.** *United States v. Mandell,* 525 F.2d at 676–77; *United States v. Paz-Sierra,* 367 F.2d at 932–33.

**26.** U.S.Const. Amend. VI; Alaska Const. art. I, § 11. For a discussion of the dangers of joint representation, see *State v. Olsen,* 258 N.W.2d 898, 904–05 (Minn.1977); American Bar Association Standards Relating to The Defense Function, § 3.5b and commentary at 213–14 (Approved Draft 1971).

■ Minnesota has recently emphasized its disapproval of joint representation, and has established procedures to assure that any waiver of the sixth amendment right to conflict-free representation meets constitutional standards. *State v. Olsen,* 258 N.W.2d 898, 903–08 (Minn.1977). Henceforth, in that state, the trial judge must personally advise the defendant of potential dangers inherent in dual representation. If the record fails to establish a "satisfactory" inquiry, the burden shifts to the state to prove beyond a reasonable doubt that a prejudicial conflict did not exist. We approve this standard adopted by the Minnesota court,[27] and it will be applied to Alaska cases tried after the mandate is issued in the instant appeal.

## VI. ACCOMPLICE INSTRUCTION

■ Stone argues that it was plain error for the trial judge to fail to give a cautionary accomplice instruction as to Moreau's statements. Although the brief does not say so, Stone must be referring to the Moreau statements that Stone was asleep and "Stone, it's the cops," as these are the only statements made by Moreau that arguably bear on Stone's guilt. Moreau did not testify at trial.

This appears to be a frivolous claim of error, especially since there is no indication that such an instruction was ever requested.

To find plain error where the alleged accomplice did not testify at trial and did not actually implicate the other, would be to disregard the purpose of the instruction: to caution the jury that an accomplice's testimony may be unreliable because of the accomplice's interest in downplaying his or her role in the alleged crime.[28]

## VII. INSUFFICIENT EVIDENCE

Defendants base their claim of insufficient evidence to convict on the grounds that the possession of a trace or the momentary possession of a trace of heroin does not meet the statutory requirement that the possession be knowing and the judicial determination that the possession include control, care and management. *See United States v. Landry,* 257 F.2d 425, 431–32 (7th Cir. 1958); *People v. Mijares,* 6 Cal.3d 415, 99 Cal.Rptr. 139, 491 P.2d 1115 (1971).

### A. Stone's Conviction.

This court has twice spoken on the question of whether the evidence of possession of a prohibited drug, in order to convict, must constitute more than an unusable trace. In *Judd v. State,* 482 P.2d 273, 280 (Alaska 1971), we held:

> Where the facts of a case show knowing possession of illegal drugs, it is unnecessary that a usable quantity be found so long as a sufficient quantity of the drug is found to permit proper identification.

**27.** The standard adopted in *Olsen* requires that the court:

> address each defendant personally and forthrightly advise him of the potential dangers of representation by counsel with a conflict of interest. The defendant must be at liberty to question the * * * court as to the nature and consequences of his legal representation. Most significantly, the court should seek to elicit a narrative response from each defendant that he has been advised of his right to effective representation, that he understands the details of his attorney's possible conflict of interest and the potential perils of such a conflict, that he has discussed the matter with his attorney or if he wishes with outside counsel, and that he voluntarily waives his Sixth Amendment protections. * * * It is, of course, vital that the waiver be established by 'clear, unequivocal, and unambiguous language.' * * * Mere assent in response to a series of questions from the

> bench may in some circumstances constitute an adequate waiver, but the court should nonetheless endeavor to have each defendant personally articulate in detail his intent to forego this significant constitutional protection. Recordation of the waiver colloquy between defendant and judge will also serve the government's interest by assisting in shielding any potential conviction from collateral attack, either on Sixth Amendment grounds or on a Fifth or Fourteenth Amendment 'fundamental fairness' basis.

*State v. Olsen,* 258 N.W.2d at 906, *quoting United States v. Garcia,* 517 F.2d 272, 278 (5th Cir. 1975).

**28.** *Gordon v. State,* 533 P.2d 25, 29 (Alaska 1975); *Galauska v. State,* 527 P.2d 459, 470–71 (Alaska 1974) (Boochever, J., dissenting); *Anthony v. State,* 521 P.2d 486, 491 (Alaska 1974); 7 Wigmore on Evidence, § 2057, at 417 (Chadbourne rev. 1978).

In *Lee v. State,* 511 P.2d 1076 (Alaska 1973), we upheld a finding of knowing possession where the amount of the drug in question was less than a milligram.[29]

Possession of even a trace of a prohibited drug may be sufficient to sustain a conviction where other evidence supports the inference of knowledge.[30] Where the prohibited substance is itself mixed with or contained within an innocuous substance or object, it is necessary that the state prove the defendant's knowledge of the narcotic character of the substance.[31] A defendant's knowledge of the narcotic character of a substance can be shown by inferences that can be reasonably drawn from facts in evidence.[32]

Applying this analysis to the evidence supporting the Stone conviction, we find that sufficient evidence existed to support his conviction. Immediately after he was alerted to the approach of the police, he was found with a napkin containing heroin in his mouth. One police officer stated that when he asked Stone what was in his mouth, Stone said it was dentures. Both officers testified that Stone was asked a number of times to spit out what was in his mouth and give it to the officers. A jury could reasonably infer that Stone knew of the narcotic character of the substance and was endeavoring to conceal the evidence.

## B. Moreau's Conviction.

We believe that a contrary result is indicated with reference to Moreau's conviction. It appears that after Stone expectorated the napkin, Moreau picked it up and may have made a move towards the bathroom. In any event, according to the testimony of the police officers, she was either seized by Officer Needham immediately[33] or within less than a second.[34] Under the

---

**29.** That conviction was affirmed by an equally-divided court, with Justice Connor dissenting, 511 P.2d at 1078–79, in the belief that the trace amount could not legally suffice to indicate that the defendant had knowing possession of an illegal drug.

**30.** *Judd v. State,* 482 P.2d at 279–80. *But see People v. Leal,* 64 Cal.2d 504, 50 Cal.Rptr. 777, 781, 413 P.2d 665, 669 (1966), which held that possession of residue or traces not usable for sale or consumption are insufficient for conviction.

**31.** *See Lee v. State,* 511 P.2d at 1077–78; *Judd v. State,* 482 P.2d at 279–80; *State v. Winters,* 16 Utah 2d 139, 396 P.2d 872, 874–75 (1964); *Wallace v. State,* 77 Nev. 123, 359 P.2d 749 (1961); *People v. Toms,* 163 Cal.App.2d 123, 329 P.2d 90 (1958). *See also People v. Gorg,* 45 Cal.2d 776, 291 P.2d 469 (1955).

**32.** *See, e. g., State ex rel. Glantz v. District Court,* 154 Mont. 132, 461 P.2d 193, 198 (1969); *People v. Martinez,* 169 Cal.App.2d 242, 336 P.2d 988, 991 (1959).

**33.** Officer Goodwin described the event as follows:

At that point—or prior to this Carol Moreau had been standing in the hallway near the bedroom and what Mr. Stone spit out of his mouth—I observed it leave his mouth, hit the floor and Miss Moreau grab it. At that point Investigator Needham contac—well, secured Miss Moreau, he grabbed her and I watched that Mr. Stone was not going to cause anymore trouble. At that point Mr. Stone did not make any attempts to make any movements that could be construed as fleeing or trying to hide anything. I sent over—at the time Investigator Needham had Carol Moreau and he was holding her. At that time I went—her hand was grasped very tightly in a fist and I opened her hand up and took out what was in her hand.

**34.** Officer Needham testified:

A. . . . The defendant spit, I felt moisture hit me in the face, I was that close to him. I saw an object go out of his mouth. I immediately turned around, saw that object go through the air and hit the floor. At that time I observed Miss Moreau open her hand, I believe her right hand, go down to the floor, pick it up, turn around and run— or move quickly down the hallway with her fist clenched.

Q What action, if any, did you take to—with respect to that hand or fist of Miss Moreau?

A At the—at approximately one second or less than a second after she picked it up I had her hand in mine. I had grabbed her hand and pulled it behind her. At that very instance she was just outside the entryway to the bathroom and she appeared to turn in this manner giving me an indication that she was headed for the bathroom. As I said I had hold of her hand, I pulled it behind her. I secured her hand behind her, I believe I put my left arm around her shoulder area, pulled back on her to make sure that she was secured, and I believe I then grabbed her left hand, secured both her arms behind her. At that time Investi-

circumstances, such momentary possession is insufficient, as a matter of law, to sustain a conviction for possession of heroin.

The United States Courts of Appeal for the Second and Seventh Circuits have held that momentarily grasping a packet of heroin does not constitute possession under a federal drug statute. In *United States v. Santore,* 290 F.2d 51, 64 (2d Cir.), *aff'd on rehearing en banc,* 290 F.2d 74 (1960), *cert. denied,* 365 U.S. 834, 81 S.Ct. 749, 5 L.Ed.2d 744 (1961), a defendant attempted to remove a package of narcotics from the trunk of a car. He was apparently frightened away and left the package in the trunk after having held it. The conviction was set aside. Judge Friendly in a concurring opinion, the reasoning of which was adopted by the court seated en banc,[35] stated:

> The same considerations apply to Narducci, save for the contention that his grasp of the package, for a period testified by the government agent to have been "less than half a minute," constituted "possession" and thus relieved the government of the need of proving knowledge of the narcotics' source. To hold this would give the act of touching an unwarranted talismanic effect. Possession implies ability to exercise control; Narducci was thwarted before achieving this. Decisions, both by divided courts, that fingerprint evidence is enough to permit an inference of possession, *Stoppelli v. United States,* 9 Cir., 1950, 183 F.2d 391, 393, certiorari denied 1950, 340 U.S. 864, 71 S.Ct. 88, 95 L.Ed. 631; *United States v. Pisano,* 7 Cir., 1951, 193 F.2d 361, 365, are not to the contrary; in such cases there was no evidence that the contact was but momentary, as there was here.[36]

Similarly, Moreau was seized before she could exercise sufficient control over the napkin to constitute "possession" under the statute.

> gator Goodwin was at the same location we were. He—I held her hand up, Investigator Goodwin forced—forced her hand open. Her hand was extremely tight, he forced it open, removed a—an object from it that appeared to be a wad of white paper.

In *United States v. Landry,* 257 F.2d 425, 431 (7th Cir. 1958), the court approved the following definition of possession:

> To "possess" means to have actual control, care and management of, and not a passing control, fleeting and shadowy in its nature.[37]

In *People v. Mijares,* 6 Cal.3d 415, 99 Cal.Rptr. 139, 491 P.2d 1115 (1971), the California court held that momentary possession for purposes of disposal did not constitute possession. The facts of that case reveal that the person in question, in an attempt to help an overdosing friend, pulled a handkerchief containing heroin out of his friend's pocket and threw it out the window of the car, before driving his friend to aid. The court stated:

> We emphasize that our decision in no way insulates from prosecution under the narcotics laws those individuals who, fearing they are about to be apprehended, remove contraband from their immediate possession. We leave intact the rule that from such conduct "it could be inferred that defendant at one time exercised physical dominion" over the narcotic.

*Id.* 99 Cal.Rptr. at 144, 491 P.2d at 1120 (citations omitted).

We agree with this analysis, and our holding does not insulate from prosecution those who seek to dispose of contraband upon discovering that the police are approaching. In such cases, it may be inferred that the defendant previously had more than momentary possession. No such inference is permissible here since the evidence reveals that Stone had the prior possession. We conclude that on the facts of this case the momentary possession of a trace of heroin on a napkin and a possible movement towards the bathroom by Moreau is not sufficient for a conviction.

**35.** 290 F.2d at 79.

**36.** 290 F.2d at 82.

**37.** *Quoting United States v. Wainer,* 170 F.2d 603, 606 (7th Cir. 1948).

On the evidence presented against Moreau, we hold that she could not be found guilty of the crime of possession of heroin.

## VIII.   RIGHT TO PRIVACY

██    Stone claims that the surrender of the napkin at gunpoint constituted an unreasonable search and seizure.   In the present case, the officers did not attempt to forcibly open Stone's mouth.   *See Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952); *State v. Tapp,* 353 So.2d 265, 266–69 (La.1977).   We do not find merit in this claim of error.

## IX.   SENTENCING

A.   Excessiveness.

██    As a result of his conviction, Stone, who had no prior record, received a term of six years.

In *Waters v. State,* 483 P.2d 199, 201 (Alaska 1971), we adopted a scale of drug crimes in order of seriousness:

1.   Smuggling or sale of large quantities of narcotics or possession of large quantities for sale.

2.   Smuggling or sale of small quantities of narcotics, or possession of small quantities for sale.

3.   Possession of narcotics without intent to sell.

4.   Marijuana offenses.

While heroin is a drug dangerous to individuals as well as to society, the defendant in this case possessed only a trace, which was not sufficient for use or for sale.   We do note, however, the recommendation of Stone's presentence report that he be denied probation and "be placed in a controlled setting for a period of time."

We find that the sentence given was excessive for the possession of the trace of heroin and that the term on resentencing should not exceed five years.   *See Salazar v. State,* 562 P.2d 694, 697 (Alaska 1977); *Donlun v. State,* 527 P.2d 472, 475 (Alaska 1974); American Bar Association Standards Relating to Sentencing Alternatives and Procedures, § 2.1(d) (Approved Draft 1971).[38]

B.   Unverified Police Statements.

Stone claims a violation of fair sentencing procedure, alleging that the judge relied on unverified police statements, specifically that Stone was a narcotics dealer and lived off Moreau's prostitution earnings.   Stone has never been convicted of a charge stemming from these activities.[39]   "[A]bsent a conviction, an indictment is absolutely no evidence of guilty conduct."   *Waters v. State,* 483 P.2d 199, 203 (Alaska 1971).[40]

It is not necessary to reach defendant's claim on these facts because of our determination that the sentence was excessive.   On remand, the sentencing court shall, of course, follow the guidelines we have established in this area.[41]

Stone's conviction is AFFIRMED, but the case is REMANDED for resentencing.   Moreau's conviction is REVERSED.

---

**38.**  We emphasize that five years is our recommendation for a maximum.  Stone had no prior felony convictions (his only previous offense was a misdemeanor gambling charge for which he was fined).  This offense involved possession of a very small amount of heroin, not possession for sale.  We urge the sentencing court to give full consideration to a term shorter than five years, with a portion suspended under conditions of probation.  *See Snyder v. State,* 585 P.2d 229, 233–35 (Alaska 1978) (remanding five-year sentence for first offender convicted of possession of large quantity of marijuana for sale); *Huff v. State,* 568 P.2d 1014 (Alaska 1977) (eight-year concurrent sentence for seller of heroin with prior record excessive; remanded for no more than four-year term).

**39.**  Stone had been charged with narcotics violations in Case No. 73–637.  The record reflects no previous prostitution related indictments or arrests.

**40.**  We have disapproved the use of unverified police contacts in sentencing, *Parks v. State,* 571 P.2d 1003, 1004 n.6 (Alaska 1977); *Thurlkill v. State,* 551 P.2d 541, 544–45 (Alaska 1976), and established a procedure for verification, *Nukapigak v. State,* 562 P.2d 697, 701 (Alaska 1977), *aff'd on rehearing,* 576 P.2d 982 (1978); *Evans v. State,* 550 P.2d 830, 847 (Alaska 1976); *Burleson v. State,* 543 P.2d 1195, 1203 (Alaska 1975).

**41.**  *See* Note 40, *supra.*