**Phillip Leon HUTCHINGS, Jr., Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–7946.**

Court of Appeals of Alaska.

Sept. 6, 2002.

Rehearing Denied Sept. 20, 2002.

Christine S. Schleuss, Anchorage, for Appellant.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

### OPINION

MANNHEIMER, Judge.

Phillip Leon Hutchings, Jr., and his brother, Jason Hutchings, were jointly charged with assaulting two police officers in the parking lot of the Riverside House in Soldotna. The two brothers appeared for trial represented by the same lawyer, Jody P. Brion.

Just before jury selection began, the prosecuting attorney urged the trial judge to ask the two defendants whether they knowingly and intelligently waived their right to be represented by separate attorneys, and whether they understood "that Mr. Brion [would be] representing both of them, although they might have diverging interests as far as any defense might be concerned". The judge began to speak, but Mr. Brion interrupted him:

> *Defense Attorney:* Your Honor, I'll warrant that I have discussed potential conflict and diverging interests with both clients, and both clients are ... informed and have consented to proceed with me representing ... both of them in one trial. That was really one of the first things we spoke about.
>
> *The Court:* Okay. And Jason [Hutchings], you have agreed that Mr. Brion will represent you?
>
> *Jason Hutchings:* Yes, Your Honor, I have.
>
> *The Court:* And Phillip [Hutchings], you have agreed that Mr. Brion will represent you, even though he is representing Jason also?

*Phillip Hutchings:* Yes, sir.

The discussion then turned to other matters. The trial proceeded, and Phillip Hutchings was ultimately convicted of third-degree assault and third-degree criminal mischief.

The primary issue in this appeal is whether the trial judge's cursory inquiry and Hutchings's two-word answer were legally sufficient to demonstrate that Hutchings knowingly waived his right to a separate attorney. For the reasons explained here, we agree with Hutchings that this record does not demonstrate a knowing waiver of independent counsel.

We therefore remand Hutchings's case to the superior court for a determination of whether Hutchings in fact understood the possibility that his interests would diverge from his brother's interests and, if so, whether he nevertheless consented to the joint representation. If the answer to either of these questions is "no", then the superior court must decide whether Brion's representation of Hutchings was adversely affected by an actual conflict of interest between the brothers. The State bears the burden of proving the absence of prejudicial conflict beyond a reasonable doubt.

Hutchings raises one other issue on appeal: whether the State's evidence was sufficient to support his conviction for third-degree assault. We agree with Hutchings that the evidence was not sufficient, and we therefore direct the superior court to amend the judgement to reflect a conviction for the lesser included offense of fourth-degree assault.

> *When two or more defendants are represented by the same attorney, Moreau v. State requires a trial judge to ascertain that each defendant has knowingly consented to the joint representation despite the potential conflicts that might arise between the defendants. Hutchings's trial judge failed to comply with Moreau, and we must therefore remand this case to the superior court for a determination of whether Hutchings was prejudiced by the joint representation.*

Criminal defendants may validly choose to be represented by the same attorney. As the United States Supreme Court noted in *Holloway v. Arkansas*, "[a] common defense often gives strength against a common attack".[1] In the present case, for instance, both Hutchings brothers testified that they were leaving the Riverside House peacefully when they were set upon by the police officers. According to both brothers, neither of them resisted—even after they were assaulted by the police.

But joint representation also holds potential dangers for defendants. The defendants may have differing attitudes toward, or different incentives for, reaching a plea agreement with the government. The interests of the defendants may collide regarding the strategy to be adopted in cross-examining government witnesses or in presenting witnesses during the defense case—for evidence that reflects favorably on one defendant may directly or indirectly cast other defendants in a less favorable light.

(For a more thorough discussion of these potential dangers, see the commentary to the American Bar Association's *Standards for Criminal Justice: The Defense Function* (3rd edition, 1993), Standard 4–3.5, "Conflict of Interest"—especially the section of the commentary entitled "Representation of Co-defendants".)

In *Moreau v. State*, 588 P.2d 275 (Alaska 1978), the Alaska Supreme Court adopted a procedure to ensure that criminal defendants are aware of the pitfalls of joint representation. The court declared that trial judges should

> address each defendant personally and forthrightly advise [them] of the potential dangers of [being represented] by counsel with a conflict of interest. [Defendants] must be at liberty to question the court as to the nature and consequences of [their choice of] representation.... [Generally], the court should seek to elicit a narrative response from each defendant that [they have] been advised of [their] right to effective representation, that [they] understand[] the details of [their] attorney's

1. 435 U.S. 475, 482–83, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426, 433 (1978).

possible conflict of interest and the potential perils of such a conflict, that [they have] discussed the matter with [their] attorney or ... with outside counsel, and that [they] voluntarily waive[ ] [their right to separate counsel].

*Id.* at 284 n. 27.[2]

The supreme court cautioned that even though the requisite waiver might sometimes be shown through a defendant's "[m]ere assent in response to a series of questions from the bench", it is generally preferable "to have each defendant personally articulate in detail [their] intent to forego this significant constitutional protection".[3]

■ The State acknowledges that Judge Brown did not conduct this kind of inquiry in Hutchings's case. Nevertheless, the State argues that the abbreviated inquiry quoted above was sufficient to satisfy *Moreau*. The State points out that, in *Moreau* itself, the trial judge did not personally address the two defendants; instead, the judge relied on the statement of the defendants' shared attorney that the defendants had expressed the desire to be jointly represented.[4]

It is true that the supreme court upheld the waiver in *Moreau* even though neither defendant was personally addressed by the court or said anything on the record. But *Moreau* adopted a stiffer standard for future cases. The supreme court declared that its new procedure—the one outlined above— "[would] be applied to Alaska cases *tried after the mandate is issued in the instant appeal*".[5] In other words, the inquiry conducted by the trial judge in *Moreau* would not pass muster now. We thus conclude that the inquiry in Hutchings's case does not meet the *Moreau* standard.

■ *Moreau* holds that, because the inquiry was insufficient, it is now the State's burden "to prove beyond a reasonable doubt that a prejudicial conflict did not exist" be-

tween the two Hutchings brothers.[6] Nevertheless, the State asks us to make Hutchings shoulder the burden of proving prejudice.

The State points out that, under federal constitutional law, when a defendant does not raise their attorney's conflict of interest until after trial, it is the defendant's burden to show that a conflict actually existed and that it adversely affected the attorney's performance.[7] The State acknowledges that in *State v. Celikoski*, 866 P.2d 139, 141–42 (Alaska App.1994), we held that the *Moreau* rule is based on Alaska law and that it is purposely more protective of defendants' rights than corresponding federal law. However, the State urges us to reconsider *Celikoski* and then supplant the *Moreau* rule with the federal rule—in other words, make Hutchings prove that an active conflict existed and that it adversely affected his attorney's performance.

We believe that it would be inappropriate for us to revise the *Moreau* rule—a rule formulated by our supreme court—under the guise of reconsidering *Celikoski*. If the State believes that the post-*Moreau* development of federal law justifies a re-examination of the burden of proof announced in *Moreau*, the State should pursue this matter with the supreme court.

■ We therefore will hold the State to the burden of proving that no prejudicial conflict existed. However, it is impossible to determine this question on the existing record.

An attorney's conflicting loyalty to another client is a species of ineffective assistance of counsel. And, as we have noted in previous decisions, a defendant's claim of ineffective assistance of counsel can rarely be resolved based solely on the record of the proceedings in which the defendant allegedly received the ineffective assistance. As we explained in *Sharp v. State*, "an attorney's trial decisions—including which potential defenses to

---

**2.** Quoting *State v. Olsen*, 258 N.W.2d 898, 906 (Minn.1977).

**3.** *Moreau* 588 P.2d at 284 n. 27.

**4.** *See id.* at 283.

**5.** *Id.* at 284 (emphasis added).

**6.** *Id.* at 284.

**7.** *See Cuyler v. Sullivan*, 446 U.S. 335, 348 & n. 14, 100 S.Ct. 1708, 1718 & n. 14, 64 L.Ed.2d 333, 347 & n. 14 (1980).

pursue, whether to object to the evidence offered by the government, how to cross-examine government witnesses, and whether and how to present a defense case—generally rest on considerations of strategy and trial tactics that are not directly addressed in open court." [8] Thus, when a defendant raises a claim of ineffective assistance of counsel, we almost always require that claim to be litigated first in the trial court (generally, through a petition for post-conviction relief) before we address it on appeal.[9]

▪ When a *Moreau* violation occurs, the courts must determine whether a "prejudicial conflict" existed between the co-defendants.[10] As we discussed earlier in this opinion, the potential conflicts between co-defendants generally arise from considerations of trial strategy and from evaluations of the evidence (both the evidence to be presented by the government and the evidence available to the defense). These matters are rarely discussed openly on the record during the defendants' trial. Thus, when a *Moreau* violation occurs and a court is obliged to determine whether a potential conflict actually flowered into an active conflict that adversely affected the attorney's representation of one or more co-defendants, a court must conduct the type of inquiry that occurs during the litigation of a petition for post-conviction relief—except that, under *Moreau*, the State bears the burden of proof (the burden of proving beyond a reasonable doubt that the defendant's representation was not prejudicially affected by an active conflict of interest).

Here, when the prosecutor raised the issue of a potential conflict of interest, the defense attorney broke into the conversation to assure the trial judge that he had "discussed potential conflict and diverging interests with both [of his] clients", and that the two brothers had given their informed consent to the joint representation. To determine whether Phillip Hutchings was prejudiced by the joint representation, the superior court must therefore investigate these attorney-client conversations.

On this point, we note the Minnesota Supreme Court's decision in *Mercer v. State*, 290 N.W.2d 623 (Minn.1980). In *Mercer*, the trial judge failed to conduct the inquiry mandated by *State v. Olsen*[11] (the Minnesota forerunner of our supreme court's decision in *Moreau*), and so the trial judge was later obliged to hold a hearing to investigate potential conflicts of interest between the co-defendants. At this hearing, the trial judge found that the defendant was not entitled to relief. On appeal, the Minnesota Supreme Court upheld this ruling, finding it "significant that the ... petitioner's attorney warned petitioner of the potential of a conflict but [the] petitioner was not concerned about this and ..., indeed, ... suggested the joint representation".[12]

We therefore remand Hutchings's case to the superior court so that the parties can litigate the question of whether Hutchings received effective assistance of counsel despite potential conflicts of interest between Hutchings and his brother. The superior court should (1) investigate the possible conflicts of interest between the brothers, (2) determine whether Phillip Hutchings was apprised of these possible conflicts when he consented to the joint representation, and (3) determine whether any of the potential conflicts of interest between the brothers actually ripened into an active conflict that adversely affected Brion's representation of Phillip Hutchings.

▪ Because Hutchings has raised the issue of conflict of interest, he has waived his attorney-client privilege to the extent necessary to resolve this claim. See Alaska Evidence Rule 503(d)(3), which states that the attorney-client privilege does not apply to "[any] communication relevant to an issue of breach of duty by the lawyer to his client". Thus, the State can require the testimony of both Hutchings and Brion.

---

8. 837 P.2d 718, 722 (Alaska App.1992).

9. *See Sharp*, 837 P.2d at 722; *Barry v. State*, 675 P.2d 1292, 1295–96 (Alaska App.1984).

10. *Moreau*, 588 P.2d at 284.

11. 258 N.W.2d 898 (Minn.1977).

12. *Mercer*, 290 N.W.2d at 626.

(It is also possible that Phillip Hutchings's waiver encompasses his brother's statements to their shared attorney. We do not decide this issue.)

*The State's evidence is not sufficient to support a finding that Hutchings committed assault with a dangerous instrument; we therefore reverse his conviction for third-degree assault and reduce the conviction to fourth-degree assault.*

Hutchings raises one other point on appeal, a point that we can resolve without waiting for the superior court's findings on remand. The issue is the sufficiency of the evidence to support Hutchings's conviction for third-degree assault.

Hutchings was charged with this offense for kicking one of the police officers. According to the State's evidence, Officers Shayne LaCroix and Gisele Webster were attempting to control Hutchings's brother Jason in the parking lot. As the officers confronted Jason, Hutchings approached LaCroix from behind, with his fist drawn back as if to strike the officer. LaCroix turned and blocked the attack, then began to wrestle with Hutchings. The two men fell to the ground. Hutchings lay on the ground, with LaCroix in a half-crouch over him. Suddenly, Hutchings straightened one of his legs and kicked LaCroix in the back of the head, either once or twice.

Hutchings was wearing heavy boots, and the blow was delivered forcefully enough that a fellow officer heard the impact. The victim of the assault, Officer LaCroix, felt a sharp pain in his head and "saw stars". Other officers described LaCroix as "staggering around", dazed and unsteady on his feet. The blow left LaCroix feeling nauseous, and afterwards he had a headache and a large lump on the back of his head.

When LaCroix went to the hospital to be examined, the emergency room doctor concluded that LaCroix had probably suffered a mild concussion but had not suffered brain injury. He therefore released LaCroix from medical care. The doctor verified that a person could die from a blow to the head if it was administered forcefully enough, but he did not assert that LaCroix had been in danger of death or serious physical injury from Hutchings's kick.

■ Hutchings was convicted of third-degree assault under AS 11.41.220(a)(1)(B)— recklessly causing physical injury to another person by means of a dangerous instrument. The State's evidence was clearly sufficient to support a finding that Hutchings recklessly caused physical injury to LaCroix.[13] The question is whether the State's evidence is sufficient to support a finding that Hutchings's boot-shod foot constituted a "dangerous instrument".

The term "dangerous instrument" is defined in AS 11.81.900(b)(14). The pertinent portion of this definition states that a dangerous instrument is "anything that, under the circumstances in which it is used, ... is capable of causing death or serious physical injury".

■ We have previously held that if the assailant's attack causes death or serious physical injury, this will be *prima facie* evidence that a dangerous instrument was used.[14] But that was not the case here. Thus, the State was obliged to present other evidence to show that Hutchings used his shod foot in a manner that created an "actual and substantial" risk of death or serious physical injury to LaCroix.[15]

■ As the emergency room doctor noted, a blow to the head is "capable" of killing someone if the blow is administered forcefully enough. But that is not the question posed by the statute. Rather, the question is whether, under the particular circumstances presented here, Hutchings used his foot in a manner that created a substantial risk of serious physical injury. As this Court noted in *Konrad v. State,* "It is the actual use of

---

**13.** See AS 11.81.900(b)(45), which defines "physical injury" as "physical pain or [any] impairment of physical condition".

**14.** *See Konrad v. State,* 763 P.2d 1369, 1374 (Alaska App.1988).

**15.** *See Konrad v. State,* 763 P.2d 1369, 1375 (Alaska App.1988).

the instrument ... that must be considered, not abstract possibilities for use of the instrument in hypothetical cases." [16]

In *Willett v. State*[17], we discussed the specific issue of when a shod foot could be deemed a "dangerous instrument". We stated that "the inquiry ... must center on the manner in which the kick was administered and the victim's vulnerability to the kick".[18]

Here, Hutchings was lying on the ground and his victim, LaCroix, was on his feet crouched over him. Hutchings was wearing heavy boots, and he was able to land one or possibly two blows in rapid succession from his prone position. But these blows did not cause serious harm to LaCroix, and LaCroix was able to end the assault by straightening up and walking away (since Hutchings remained lying on the ground). There is little to indicate that LaCroix was in any greater physical danger than if Hutchings had punched him in the head when he was not looking.

Given these circumstances, we conclude that the State's evidence was insufficient to support a finding that Hutchings's shod foot constituted a "dangerous instrument". We therefore reverse Hutchings's conviction for third-degree assault.

However, as we noted above, the State's evidence is clearly sufficient to support the jury's finding that Hutchings recklessly caused physical injury to LaCroix. We therefore direct the superior court to amend the judgement to reflect a conviction for the lesser included offense of fourth-degree assault under AS 11.41.230(a)(1)—"recklessly caus[ing] physical injury to another person".

*Conclusion*

This case is REMANDED to the superior court for a hearing on whether Hutchings received ineffective assistance of counsel because of an active, prejudicial conflict of interest between Hutchings and his brother, Jason. The superior court shall make findings on this issue and shall transmit those findings to this Court within 90 days of our decision. The parties shall then have 30 days to file memoranda responding to the superior court's findings. Upon our receipt of the parties' memoranda, we shall resume our consideration of this issue.

In the meantime, Hutchings's conviction for third-degree assault is REVERSED. The superior court is directed to reduce the crime to the lesser included offense of fourth-degree assault, and to re-sentence Hutchings.

---

**16.**   763 P.2d 1369, 1373 (Alaska App.1988).

**17.**   836 P.2d 955 (Alaska App.1992).

**18.**   *Id.* at 959.