**George A. KONRAD, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–2126.**

Court of Appeals of Alaska.

Nov. 10, 1988.

---

Janet L. Crepps, Gilmore & Feldman, Anchorage, for appellant.

**1372**

Cynthia M. Hora, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

George A. Konrad was convicted, following a jury trial, of assault in the third degree, assault in the second degree, and terroristic threatening. Konrad appeals, arguing that the trial court erred in failing to dismiss his indictment, that Alaska's terroristic threatening statute is unconstitutionally vague, that the evidence presented at trial was insufficient to support his conviction, that the trial court erred in excluding testimony offered to impeach the victim, and that the court erred in denying his motion for a new trial when a new judge was assigned to his case for purposes of conducting sentencing proceedings. We affirm Konrad's convictions for second-degree assault and terroristic threatening, but vacate his conviction for third-degree assault.

## BACKGROUND

Konrad was indicted for a series of incidents that occurred during the breakup of his marriage to Luann Konrad. The indictment charged Konrad with third-degree assault for recklessly causing physical injury to Luann Konrad by striking her on the head and ribs with his hands, with second-degree assault for recklessly causing serious physical injury to Luann by throwing her off a bed onto a wooden crate, and with terroristic threatening for engaging Luann in a telephone conversation in which Konrad repeatedly threatened to kill her.

## ASSAULT IN THE THIRD DEGREE

On May 9, 1986, following a heated argument, George Konrad struck Luann Konrad twice with his hands: once on the head and once on the ribs. Luann Konrad experienced abdominal pain following the as-

sault. Several days later a physician determined that the blow to Luann's midsection had injured her spleen, causing it to bleed into her abdominal cavity. The injury resolved itself without treatment.

Based on the May 9 incident, the state requested the grand jury to charge Konrad with assault in the third degree. The state proceeded under AS 11.41.220(a)(2), which states that "a person commits the crime of assault in the third degree if that person recklessly ... causes physical injury to another person by means of a dangerous instrument." The state's theory was that Konrad's hands were dangerous instruments.

After reading the statutory definition of "dangerous instrument" to the grand jury, the prosecutor stated, in relevant part: "I would instruct you at this time that in the state of Alaska hands or feet can be considered a dangerous instrument under the definition that I have given you of a dangerous instrument." The grand jury returned a true bill.

Prior to trial, Konrad moved to dismiss the third-degree assault charge, challenging the propriety of the prosecutor's instruction to the grand jury. The superior court denied Konrad's motion. At trial, Konrad unsuccessfully moved for a judgment of acquittal on the third-degree assault charge, contending that the evidence was insufficient to establish the use of a dangerous instrument. Konrad now renews these arguments on appeal.

The term "dangerous instrument" is defined in AS 11.81.900(b)(11):

(11) "[D]angerous instrument" means any deadly weapon or anything which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is capable of causing death or serious physical injury.

"Physical injury" and "serious physical injury" are in turn defined in AS 11.81.900(b)(40) and (50):

(40) "[P]hysical injury" means a physical pain or an impairment of physical condition;

(50) "[S]erious physical injury" means

(A) physical injury caused by an act performed under circumstances that create a substantial risk of death; or

(B) physical injury that causes serious and protracted disfigurement, protracted impairment of health, protracted loss or impairment of the function of a body member or organ, or that unlawfully terminates a pregnancy.

This court has never squarely decided whether a bare hand can be a "dangerous instrument" within the meaning of these provisions. In *Wettanen v. State*, 656 P.2d 1213 (Alaska App.1983), we held that a bare foot could qualify as a dangerous instrument under certain circumstances. The evidence there established that Wettanen had kicked another person repeatedly about the face and head, inflicting serious physical injuries. Because the state neglected to establish whether Wettanen was shod when he committed the assault, it was necessary to decide if a bare foot could qualify as a dangerous instrument. We concluded that sufficient evidence had been presented at trial to allow a finding that Wettanen's foot was a dangerous instrument, even if it was unshod. *Id.* at 1218. In reaching this conclusion, we expressly declined to decide whether a bare hand could similarly qualify as a dangerous instrument, noting that the cases from other jurisdictions on the issue are in conflict. *Id.* at 1218.

Since deciding *Wettanen*, we have had no occasion to resolve this issue. In at least one case, however, we have assumed that a hand might qualify as a dangerous instrument in some situations. *See New v. State*, 714 P.2d 378, 383 (Alaska App.1986).

 For the purpose of deciding the present case, we may likewise assume that there is no categorical prohibition against a hand being deemed a dangerous instrument under the definition set forth in AS 11.81.900(b)(11). Our prior cases nevertheless firmly establish that the question of whether a hand qualifies as a dangerous instrument in any given case must be answered by examining the precise manner in which the hand is actually used.

The need to focus on the specific circumstances of each case derives from the definition of "dangerous instrument." While the statutory definition encompasses "anything" that is capable of causing death or serious physical injury, the express language of the statute requires that an instrument's potential for causing death or serious physical injury be assessed in light of "the circumstances in which it is used, attempted to be used, or threatened to be used." AS 11.81.900(b)(11). It is the actual use of the instrument in each case that must be considered, not abstract possibilities for use of the instrument in hypothetical cases.

We emphasized this point in *Wettanen*, cautioning that "every … blow, even if it causes serious injury, will not automatically be an assault with a dangerous instrument." *Wettanen*, 656 P.2d at 1217. We pointed out that the inquiry must focus on the vulnerability of the victim and the specific nature of the assault in each case. *Id.* at 1217. In this regard, we emphasized that "the requirement of a dangerous instrument serves to shift the focus of the trier of facts' attention from the result (physical injuries), which in any given case may have been unforeseeable to the defendant at the time the assault was committed, to the manner in which the assault was committed." *Id.* at 1218.

We elaborated on *Wettanen* in *Carson v. State*, 736 P.2d 356 (Alaska App.1987), *hearing denied*, 742 P.2d 782 (Alaska 1987), a case involving an analogous situation. In that case, police officers performing a misdemeanor arrest subdued Carson by kicking him in the groin and unleashing a police dog, which bit Carson on the legs and buttocks until he ceased struggling. At issue was whether the officers' actions amounted to "deadly force." The applicable statute defined "deadly force" to include any force used under circumstances that "create a substantial risk of causing death or serious physical injury." *See* AS 11.81.900(b)(12); *Carson*, 736 P.2d at 361.

We found that the evidence in *Carson* did not support a finding that deadly force had been used. In reaching this conclu-

sion, we emphasized the need to focus on the actual risk of serious physical injury posed in the specific case, rather than on the abstract possibility of serious physical injury under other, hypothetical circumstances. We said, in relevant part:

> Although we can certainly conceive of cases in which specific testimony describing a kick to the groin or an attack by a dog would support the inference that a substantial risk of death or serious physical injury was created, we are unwilling to conclude that testimony establishing no more than the unadorned fact of a kick to the groin or an attack by a police dog is *per se* sufficient to create a jury question as to the use of deadly force. The issue is not one to be resolved in the abstract. There must, at a minimum, be some particularized evidence from which a reasonable juror could conclude that a substantial risk of serious physical injury was actually created in the specific case at bar.
>
> The issue is analogous to one we considered in *Wettanen v. State.* There, we held that, while any object, including an unshod foot, that was capable of inflicting serious physical injury might qualify under the broad statutory definition of "dangerous instrument," the actual determination of whether a dangerous instrument was used must be made on a case-by-case basis, based on the totality of the circumstances surrounding the actual use of the object in question.

*Carson,* 736 P.2d at 361 (citations omitted).

██ When read together, *Wettanen* and *Carson* stand for the proposition that, before a hand may be deemed a "dangerous instrument," the state must present particularized evidence from which reasonable jurors could conclude beyond a reasonable doubt that the manner in which the hand was used in the case at issue posed an actual and substantial risk of causing death or serious physical injury, rather than a risk that was merely hypothetical or abstract.

██ Obviously, whenever serious physical injury does in fact occur, there will be *prima facie* evidence to support a finding that a dangerous instrument was used. Conversely, when serious physical injury does not occur, other case-specific evidence must be adduced to establish that the risk of such injury was both actual and substantial, even though it did not in fact occur.

██ The facts of the present case are problematic when viewed in light of this analysis. We consider initially the grand jury proceedings. The state did not contend below, and it does not argue on appeal, that Luann Konrad suffered serious physical injury when Konrad struck her with his hands. In presenting its case to the grand jury, the prosecution instructed that "under Alaska law hands or feet can be considered dangerous instruments."

The ambiguity of this instruction is troublesome. While it might be taken to indicate that the decision as to whether Konrad's hands were dangerous instruments was a factual one to be made by the grand jury, it might as readily be taken to indicate that there was no need at all for the grand jury to consider the issue, since it was settled as a matter of Alaska law. In our view, the giving of this instruction raises a serious question as to whether the grand jury in Konrad's case ever actually determined, as a factual matter, whether Konrad used his hands in a manner capable of inflicting death or serious physical injury.

In any event, even without the ambiguous instruction, we believe that the circumstances of the present case would have been sufficiently unique to require a specific admonition to the grand jury concerning the manner in which it was required to determine whether a dangerous instrument had been used.

We recognize that the grand jury was appropriately instructed on the statutory definitions of "dangerous instrument," "physical injury," and "serious physical injury." Nevertheless, when, as in the present case, the defendant is alleged to have used a dangerous instrument that

was not a "deadly weapon"[1] and that did not actually inflict death or serious physical injury, the possibility that the grand jury might decide the instrument's potential for causing injury as an abstract or hypothetical matter is, in our view, sufficiently great to require that an express instruction be given. The instruction should alert the grand jury to the need for it to find, based on the evidence in the case before it, that the defendant used an instrument in a manner that actually created a substantial risk of death or serious physical injury. In view of the lack of an appropriate clarifying instruction and the ambiguity of the instruction actually given, we conclude that the trial court erred in denying Konrad's pretrial motion to dismiss the count charging him with assault in the third degree.

We must separately consider whether sufficient evidence was presented at trial to support Konrad's conviction of assault in the third degree. As we have already indicated, the state does not allege that the evidence established that Konrad inflicted serious physical injury by striking Luann Konrad with his hands. While Luann suffered internal bleeding from the spleen, the condition healed without treatment within a short period of time. No medical evidence was adduced to establish that Luann's condition verged on becoming more serious or that a blow to the ribs similar to that inflicted by Konrad actually posed a risk of inflicting more severe injuries to the spleen or to other internal organs. *See, e.g., James v. State*, 671 P.2d 885, 888–89 (Alaska App.1983), *rev'd on other grounds, State v. James*, 698 P.2d 1161 (Alaska 1985).

Apart from Luann Konrad's testimony that Konrad's hand was in a fist when he struck her, there is nothing in the record to establish that the manner in which Konrad used his hands was inordinately violent or particularly calculated to inflict serious physical injury. No evidence was offered to suggest that Konrad had received martial arts training or that he was otherwise skilled in using his hands to inflict physical injury.

Other than the fact that Konrad had awakened Luann Konrad shortly before he assaulted her, there was no evidence to suggest that she was especially susceptible to incurring a serious physical injury. Although it can be inferred that Luann would have been better able to ward off Konrad's blows and to prevent the injuries that she did receive had she not recently been asleep, nothing in the evidence establishes that she was vulnerable to suffering injury more serious than that actually inflicted merely because she had been sleeping and was caught off guard by Konrad's assault.

In arguing that the evidence was sufficient to support a finding that Konrad's hands were dangerous instruments, the state notes that, after the assault, Konrad offered to take Luann to the doctor when he got back from work. The state contends that this evidence reflects upon the seriousness of Konrad's assault and could legitimately be relied on by the jury.

To the extent that Konrad's offer of assistance betrayed his awareness that he had assaulted Luann Konrad with sufficient force to inflict injuries requiring medical treatment, the state is correct. However, the evidence does nothing to indicate that Konrad believed he had inflicted serious physical injury, as opposed to nonserious physical injury. Consequently, the evidence fails to establish, either directly or inferentially, that his assault created an

---

**1.** "Deadly weapon" is defined in AS 11.81.-900(b)(13) as follows:
> "[D]eadly weapon" means any firearm, or anything designed for and capable of causing death or serious physical injury, including a knife, an axe, a club, metal knuckles, or an explosive....

Under the definition of "dangerous instrument" set out in AS 11.81.900(b)(11), any deadly weapon qualifies as a dangerous instrument, without regard to the circumstance in which it is actually used. The inherent danger posed by deadly weapons justifies their treatment as dangerous instruments without regard to actual use. *See, e.g., Krasovich v. State*, 731 P.2d 598 (Alaska App.1987). We emphasize that our discussion in the text is restricted to dangerous instruments that would not qualify within the statutory definition for a deadly weapon.

actual and substantial risk of serious physical injury.

In ruling on the sufficiency of the evidence at trial, we must view the evidence and the inferences arising therefrom in the light most favorable to the state to determine whether reasonable jurors could conclude that the defendant's guilt was established beyond a reasonable doubt. *Snyder v. State*, 661 P.2d 638, 641 (Alaska App. 1983); *Des Jardins v. State*, 551 P.2d 181, 184 (Alaska 1976). Applying this standard to the present case, we conclude that insufficient evidence was adduced to support Konrad's conviction of third-degree assault. In our view, the evidence cannot justify a finding that Konrad's hands qualified as dangerous instruments. On the record of the present case, a conclusion that Konrad's hands were capable of causing death or serious physical injury under the circumstances in which they were actually used—that is, that they actually created a substantial risk of death or serious physical injury to Luann Konrad—would be wholly speculative.

Were we to find sufficient evidence in this case to support a conclusion that Konrad's hands were dangerous instruments, a similar conclusion would be justified in virtually every case involving blows struck with fists that inflicted some physical injury. We conclude that the trial court erred in denying Konrad's motion for a judgment of acquittal as to the charge of assault in the third degree.

## ASSAULT IN THE SECOND DEGREE

██ On August 24, 1986, Konrad became angry with Luann Konrad and threw her off of their bed. She struck the corner of a wooden crate that was on the floor; as a result of the blow Luann suffered a collapsed right lung. Treatment of this injury required surgical perforation of Luann's ribcage and the insertion of a tube to reinflate the lung. The treatment necessitated Luann's hospitalization for a period of six days.

Konrad's August 24 assault was the basis for his conviction of assault in the second degree. Under AS 11.41.210(a)(2), second-degree assault occurs when a "person recklessly causes serious physical injury to another person." On appeal, Konrad argues that the evidence below was insufficient to establish serious physical injury.

"Serious physical injury" may be proved, *inter alia*, by evidence establishing that the defendant inflicted physical injury by "an act performed under circumstances that create a substantial risk of death." AS 11.81.900(b)(50)(A). This definition of serious physical injury focuses on the circumstances in which the defendant performed the act that caused physical injury. The fortuity of prompt medical treatment and speedy recovery by the victim is not a primary consideration. *See James v. State*, 671 P.2d at 888–89.

At trial, Dr. David D. Anderson testified that Luann Konrad sustained a pneumothorax, or a collapsed lung caused by air seeping into the chest cavity. Dr. Anderson characterized the injury as life threatening. He likened the risk of death to that involved in open heart surgery. Despite repeated cross-examination by Konrad's counsel, Dr. Anderson steadfastly refused to say that the risk of death posed to Luann Konrad by her injury was not substantial. To the contrary, the doctor testified that "there is a definite risk of death, there is no getting around it."

When viewed in the light most favorable to the state, Dr. Anderson's testimony provides ample evidence from which the jury could have reasonably concluded that Luann Konrad suffered a serious physical injury as a result of the August 24 assault. The trial court did not err in denying Konrad's motion for a judgment of acquittal as to the charge of assault in the second degree.

## TERRORISTIC THREATENING

On November 20, 1986, George and Luann Konrad spoke to each other by telephone. Their conversation lasted for about one-half hour. During the second half of the conversation, Konrad repeatedly threatened to kill his wife if she prevailed in a child custody dispute that was then pend-

ing in the superior court. Luann Konrad recorded the entire conversation. Konrad's death threats served as the basis for his conviction of terroristic threatening.

### A. Failure to Present Exculpatory Evidence to the Grand Jury

During the grand jury hearing on Konrad's case, the prosecution played only the latter portion of the recorded conversation between Konrad and his wife. That was the portion in which Konrad made his threatening statements. Prior to trial Konrad unsuccessfully moved to dismiss the terroristic threatening charges, arguing that the prosecution breached its duty to present exculpatory evidence by failing to play the entire recorded conversation, as well as two prior conversations between Konrad and Luann that were recorded on the same tape.

Konrad renews his argument on appeal. He contends that the first portion of the tape would have tended to establish that Luann was not particularly afraid of Konrad and that she in effect goaded him into making the threats upon her life.

■ We are unpersuaded by Konrad's argument. While the prosecution must disclose exculpatory evidence to the grand jury, *Frink v. State*, 597 P.2d 154, 164 (Alaska 1979), there is no duty to present "possibly favorable" evidence or to develop potential theories of defense. *Abruska v. State*, 705 P.2d 1261, 1272 (Alaska App. 1985); *Tookak v. State*, 648 P.2d 1018, 1021 (Alaska App.1982).

■ In the present case, there was nothing inherently exculpatory in the portion of the recorded conversations that remained unplayed. Konrad was charged with terroristic threatening under AS 11.-56.810(a)(2), which applies when a person, "with intent to place another person in fear of death or serious physical injury to the person or the person's immediate family, makes repeated threats to cause death or serious physical injury to another person." Because this statutory definition hinges the offense of terroristic threatening on the specific intent of the accused rather than on the subjective reaction of the victim, the fact that Luann Konrad may not have appeared to be particularly afraid of Konrad during the initial portion of their conversation is not directly relevant to the issue of Konrad's guilt or innocence. Moreover, no defense arises under the statutory definition of the offense merely because the accused is in some manner provoked to threaten the victim.

It is theoretically possible that the unplayed portions of the tape might have had some indirect relevance on the issue of Konrad's specific intent to place Luann Konrad in fear. A person who is provoked and makes threats out of anger may act without a specific intent to cause fear. Thus, if the earlier portion of the recorded conversation revealed significant provocation, it should arguably have been played to provide a context from which the grand jury could have determined Konrad's intent in making the threats contained in the latter part of the recording.

In this connection, however, our review of the recorded conversation convinces us that the unplayed portion of the tape could have had no substantial exculpatory value. To the extent that the unplayed portion reveals any provocation of Konrad by Luann Konrad, that provocation is decidedly slight in comparison to the threats of death that followed. Given the marginal extent of provocation on the unplayed portion of the tape and the repeated and apparently deliberate nature of Konrad's subsequent death threats, we are satisfied that a playing of the full conversation would not have been substantially favorable to the defense in this case. We find no error.

### B. Lesser–Included Offense

Konrad was initially charged by information with attempted coercion, in violation of AS 11.41.530(a)(1) and AS 11.31.100(d)(4). Because coercion is a class C felony, attempted coercion constitutes a class A misdemeanor. AS 11.31.100(d)(4). In presenting Konrad's case to the grand jury, the prosecution elected to ask for a charge of terroristic threatening instead of attempted

coercion. The offense is a class C felony. *See* AS 11.56.810(b).

██ During the grand jury hearing, a grand juror asked the prosecutor, with respect to the terroristic threatening charge:

Is there—are there other avenues of potential counts or charges for threatening people's lives?

The prosecutor responded:

We considered other charges, but unfortunately there's not anything that's a real good fit, and the legislature amended terroristic threatening; it used to not include threats that were made to people and their family members, and they recently amended it so it seems to me that that's probably the closest fit that we're going to get.

In moving to dismiss the indictment below, Konrad argued that the prosecutor was obligated to submit the crime of attempted coercion to the grand jury as a possible lesser-included offense of terroristic threatening. Konrad repeats this argument on appeal. He acknowledges that there is normally no duty to offer the grand jury a lesser-included offense when sufficient evidence is presented to support a greater offense. *See Oxereok v. State*, 611 P.2d 913, 916–18 (Alaska 1980); *Castillo v. State*, 614 P.2d 756, 763 (Alaska 1980). Nevertheless, Konrad insists that an instruction on attempted coercion was necessary in the present case in light of the grand jury's specific request for possible alternative charges.

In our view, however, the prosecution's response to the grand juror's inquiry was reasonable. "[A]s legal advisor to the grand jury, the prosecutor may appropri-ately explain the law and express an opinion on the legal significance of the evidence...." I *Standards for Criminal Justice*, Standard 3–3.5 (2d ed. 1980). Here, the prosecutor's opinion that terroristic threatening appeared to be the "best fit" was accurate.

██ Contrary to Konrad's position below and on appeal, attempted coercion is not a lesser-included offense of terroristic threatening. As defined in AS 11.41.-530(a)(1), coercion is committed when the accused instills fear in another person by threats of physical injury in order to compel the other person "to engage in conduct from which there is a legal right to abstain or abstain from conduct in which there is a legal right to engage...." To prove attempted coercion, the prosecution would have been required to establish not only that Konrad intended to cause fear on Luann Konrad's part, but also that he did so with the express purpose of coercing her to abstain from pursuing her custody claim.

██ This additional burden would have placed the prosecution at a significant disadvantage. Because Konrad may well have intended to place Luann Konrad in fear without actually intending to coerce her into relinquishing her claim of custody, he might have been found guilty of terroristic threatening without also being found guilty of attempted coercion. Under the circumstances, then, attempted coercion was not a lesser-included offense of terroristic threatening, and the prosecution's advice that terroristic threatening was a "better fit" was not unreasonable.[2]

2. Although the argument in the body of Konrad's briefs appears to be that attempted coercion is the lesser offense that the prosecution should have called to the attention of the grand jury, the statement of points on this issue in Konrad's opening brief refers to the class B misdemeanor of harassment, AS 11.61.120(a)(4), which prohibits threatening telephone calls that are made with intent to harass or annoy. Like attempted coercion, harassment is not a lesser-included offense of terroristic threatening under the circumstances of the present case. Harassment requires proof that the accused was the person who made the threatening telephone call and that the call was made with the intent to harass. In the present case, the recording made by Luann Konrad did not reveal who initially placed the call. Even assuming the state could have proved that it was Konrad, rather than his wife, who placed the call, it would still have had to prove that Konrad's original purpose in placing the call was to harass or annoy. In contrast, the crime of terroristic threatening required the state to prove only that Konrad's purpose was to instill fear of serious physical injury in his wife at the time he uttered the threatening remarks.

## C. Vagueness

■ Konrad argues for the first time on appeal that Alaska's terroristic threatening statute is unconstitutionally vague and overbroad. In relevant part, AS 11.56.-810(a)(2) provides:

(a) A person commits the crime of terroristic threatening if the person

. . . . .

(2) with intent to place another person in fear of death or serious physical injury to the person or the person's immediate family, makes repeated threats to cause death or serious physical injury to another person.

Konrad's claim of vagueness is premised on the statute's use of the word "repeated," which modifies the word "threats." According to Konrad, "repeated" is ambiguous, because it may be understood to mean either a threat uttered more than one time in a single conversation or a threat made on more than one occasion. Konrad claims that this ambiguity deprived him of fair notice as to what conduct on his part was prohibited. He also claims that the ambiguity invites arbitrary enforcement of the statute.

Konrad's argument is unconvincing. A statute is impermissibly vague when it fails to give adequate notice of what conduct it prohibits, that is, when it is so imprecise that ordinary persons of common intelligence are left to guess at its meaning and are apt to differ as to its scope. *Summers v. Anchorage*, 589 P.2d 863, 866–67 (Alaska 1979). We find no such imprecision in the statutory phrase "repeated threats."

■ "Repeated" is not defined in Alaska's revised criminal code.[3] Its ordinary definition must be considered. *Gibson v. State*, 719 P.2d 687, 690 (Alaska App.1986). According to Webster's Collegiate Dictionary, "repeated" means: "said, made, done, or happening again, or again and again." We find little ambiguity in this definition. In context, a "repeated threat" is simply a threat made more than once.

*See, e.g., State v. Diede*, 319 N.W.2d 818, 821 (S.D.1982).

While the ordinary meaning of "repeated threats" certainly encompasses a threat made on more than one occasion, there is no reason to suppose, as Konrad suggests, that these words can reasonably be read to exclude threats made more than once on a single occasion. The Colorado Supreme Court, relying on the ordinary meaning of "repeatedly," rejected a vagueness claim almost identical to the one advanced by Konrad here. *See People ex rel. VanMeveren v. County Court, Etc.*, 191 Colo. 201, 551 P.2d 716 (1976). In reaching its conclusion, the court said:

"Repeatedly" is a word of such common understanding that its meaning is not vague. It simply means in the context of this statute that the defendant used insulting, taunting or challenging language more than one time.

*Id.* 551 P.2d at 720.

We find no sound basis for refusing to apply the ordinary meaning of "repeated" in the present case. The challenged portion of Alaska's terroristic threatening statute was adopted by the legislature in 1984, apparently without commentary. *See* Chapter 108, § 1, SLA 1984. Of the various other states having terroristic threatening statutes similar to Alaska's, almost none require more than a single threat. *See generally Model Penal Code* § 211.3 commentary at 206 n. 8 (1980); Annotation, *Validity And Construction of Terroristic Threat Statutes*, 45 A.L.R. 4th 949 (1986). Accordingly, there seems to be no statutory history in Alaska or general trend elsewhere indicating a need to restrict the plain meaning of Alaska's statute.

The only state adopting a requirement similar to that urged by Konrad appears to be Hawaii, which provides for a misdemeanor conviction of terroristic threatening based on a single threat, *see* Haw.Rev.Stat. § 707–715 (1985), but requires "threatening another person on more than one occasion"

---

**3.** The word "threat" is defined in AS 11.81.-900(b)(55) to include "a menace, however, communicated," to inflict physical injury. Konrad

does not challenge the adequacy of the statutory definition of "threat."

for conviction of a felony. *See* Haw.Rev. Stat. § 707–716 (1985).

It is uncertain whether Alaska's terroristic threatening provision was patterned after Hawaii's.[4] For purposes of construing Alaska's statute, the issue seems unimportant. Assuming Alaska's statute was drawn from Hawaii's, our legislature's election to depart from the wording of the Hawaii statute by requiring a "repeated" threat rather than a threat "on more than one occasion," would appear to be significant. Assuming Alaska's statute was not taken from the Hawaii code, then Hawaii's decision to require a threat "on more than one occasion" would be significant only insofar as it establishes that the Alaska legislature could easily have drafted a statute to require a threat on more than one occasion had it wanted to do so.

While we hold that the terroristic threatening statute is not impermissibly vague when "repeated" is accorded its ordinary meaning, we nonetheless recognize that applying the literal definition of the word may create problems in certain unusual circumstances in which a question might arise as to whether a single statement contains more than one threat. The obvious purpose in requiring that a threat be "repeated" before becoming a terroristic threat within the meaning of AS 11.56.-810(a)(2) is to assure that the harsh sanction of felony prosecution will not be visited upon a person for making a rash statement out of transitory anger or in the heat of passion. This purpose is reflected in the reading generally given to terroristic threatening provisions in other jurisdictions. *See, e.g.,* Annot., *supra,* 45 A.L.R. 4th § 31. Accordingly, strict adherence to the literal meaning of "repeated threats" will be inappropriate in some situations.

■ When a threat is uttered several times in virtually the same breath, elaborated upon without any significant interruption, or repeated at the request of the listener, the statutory requirement of repetition will not, in our view, be met. Rather, in order to justify the finding that a threat has been repeated or that more than one threat has been made during a single conversation, the evidence must establish a clear break in context between initial and subsequent threats and the passage of sufficient time between threats to permit reflection. The ultimate question should be whether the repetition of the threat amounted to a separate act by the accused or whether it is part of a single continuous act. Resolution of this question lends itself to no inflexible rule and should ordinarily be left to the jury, whose decision should be on the totality of the evidence in the case at issue.

■ In the present case, there was ample evidence to permit a finding that Konrad made "repeated threats" to take Luann Konrad's life. The recording of the telephone conversation reveals that Konrad threatened to kill his wife numerous times. The threats were not made in a continuous manner. Rather, they were repeated over a period of more than fifteen minutes. Konrad's threats were separated not only in time, but also by the subject matter of the conversation. The individual threats were interspersed with discussion concerning other matters. Sufficient time elapsed between the threats to permit reflection,

4. The derivation table included in the Alaska Department of Law's Criminal Law Manual lists Hawaii Revised Statute 707–715 in connection with Alaska's terroristic threatening statute. This reference to the Hawaii statute is of questionable significance, however, because the derivation table does not necessarily indicate the actual source of any given Alaska statute. A preface to the derivation table cautions, in relevant part:

It should be noted that the derivation listing was compiled by the Criminal Division of the Department of Law *after* enactment of the revised code. Statutes from other jurisdictions that were actually considered by the Criminal Law Revision Subcommission are set out in a table appearing as an appendix to each volume of the six-part Tentative Draft of the code published by the Subcommission. *Id.* at 6–1—6–2 (emphasis in original). The tentative draft contained no terroristic threatening provision. We note, moreover, that the derivation table referred to Hawaii Revised Statute 707–715 even before the terroristic statute was amended in 1984 to add subsection (a)(2), which for the first time added the provision requiring "repeated threats."

and the threats were uttered in a composed and calculated tone of voice.

Konrad's conduct is thus within the core prohibition of the statute. To the extent that there is any potential for uncertainty in some situations, Konrad's case falls well outside the area of uncertainty. *See, e.g., Levshakoff v. State*, 565 P.2d 504, 508 (Alaska 1977). We reject both Konrad's vagueness argument [5] and his related contention that insufficient evidence was presented below to support his conviction for terroristic threatening.

## OTHER ISSUES

Konrad raises two additional issues that do not require extended discussion. First, he contends that the trial court erred in excluding the testimony of Keith Wiger. Wiger's testimony, however, was offered for the sole purpose of impeaching Luann Konrad's testimony concerning an entirely collateral matter. We find no abuse of discretion in the exclusion of his testimony. *See, e.g., Moss v. State*, 620 P.2d 674, 676–77 (Alaska 1980); *Oswald v. State*, 715 P.2d 276, 278–79 (Alaska App.1986).

Konrad also claims that the court erred in failing to grant a new trial. Konrad's trial was conducted before Superior Court Judge Duane K. Craske, who was on temporary assignment in Anchorage from Sitka. Following the trial, Judge Craske returned to Sitka; Konrad's sentencing hearing was assigned to Superior Court Judge S.J. Buckalew, Jr., of Anchorage. Konrad thereafter moved for a new trial, pursuant to Alaska Criminal Rule 25(c), which provides:

> *After Verdict.* If by reason of absence from the district ... the judge

before whom the action has been tried is unable to perform the duties to be performed by the court after a verdict or finding of guilt, any other judge regularly sitting ... may perform those duties; but if such other judge is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial.

Judge Buckalew denied Konrad's motion and proceeded to impose sentence.

Judge Buckalew's denial of a new trial did not amount to an abuse of discretion.[6] Criminal Rule 25(c) vests a newly-assigned judge with discretion to order a new trial if that judge "is satisfied that he cannot perform those duties [i.e., sentencing] because he did not preside at the trial or for any other reason...." Here, there is no indication that Judge Buckalew was unable to perform his duties. To the contrary, the record discloses that the judge thoroughly familiarized himself with the case by reviewing the entire record of trial proceedings. Even had he not reviewed the record, Judge Buckalew would have been in essentially the same position as any judge who imposes a sentence after a plea of guilty or no contest. Under the circumstances, we find no abuse of discretion.

The convictions for terroristic threatening and assault in the second degree are AFFIRMED. The conviction for assault in the third degree is VACATED. This case is REMANDED to the superior court, with directions to amend the judgment accordingly.

---

**5.** Insofar as Konrad has claimed that AS 11.56.-810(a)(2) would permit arbitrary enforcement, he has failed to establish any history of arbitrary enforcement to support his claim. *See, e.g., Summers v. Anchorage*, 589 P.2d at 866–67; *Holton v. State*, 602 P.2d 1228, 1234 (Alaska 1979).

**6.** The record discloses no efforts by Konrad's trial counsel to reschedule sentencing for a time when Judge Craske might have been available or to make other arrangements that might have allowed the sentencing hearing to be conducted

by Judge Craske. Had trial counsel made such efforts, we believe that reassignment of the case for sentencing purposes would have amounted to error, absent compelling circumstances precluding the trial judge's participation. We emphasize, however, that on appeal Konrad does not argue that he should have been sentenced by Judge Craske. Rather, his only point is that he should have received a new trial before Judge Buckalew. Our holding addresses only that contention.