**Lewis Nels OLSON, Appellant/Cross-Appellee,**

v.

**STATE of Alaska, Appellee/Cross-Appellant.**

**Nos. A–10607, A–10617.**

Court of Appeals of Alaska.

Nov. 10, 2011.

**30.** *See State v. Savage,* 172 N.J. 374, 799 A.2d 477, 490 (2002).

Jane B. Martinez, Anchorage, for Mr. Olson.

Mary A. Gilson, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for the State of Alaska.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

MANNHEIMER, Judge.

Lewis Nels Olson attacked his girlfriend and broke her jaw. Based on this incident, Olson was charged with first- and second-degree assault, and the jury found him guilty of both charges. Olson moved for a judgement of acquittal on both charges.

The superior court granted Olson's motion with respect to the first-degree assault charge, because the court concluded that Olson had not used a dangerous instrument when he attacked his girlfriend (a required element of first-degree assault under subsection (a)(1) of the statute).[1] However, the superior court upheld Olson's conviction for second-degree assault.

In this appeal, Olson renews his argument that the evidence presented at his trial was not legally sufficient to support his conviction for second-degree assault. Specifically, Olson contends that there was insufficient evidence that the injury to his girlfriend's jaw constituted "serious physical injury" (a required element of second-degree assault under subsection (a)(2) of the statute).[2] Olson also argues that the sentence he received for this crime—7 years' imprisonment, with 3 years suspended (*i.e.*, 4 years to serve)—is excessive.

In its cross-appeal, the State challenges the superior court's decision to grant Olson a judgement of acquittal on the first-degree assault charge. The State argues that there was sufficient evidence to support a finding that, when Olson struck his girlfriend, he used his hand as a "dangerous instrument".

For the reasons explained here, we uphold all three of the superior court's challenged decisions. That is, we affirm the superior court's decision to acquit Olson of first-degree assault, and we affirm Olson's conviction for second-degree assault, as well as the sentence he received for that crime.

*Underlying facts*

Lewis Olson and his girlfriend, Christine Petla, had a tumultuous relationship that began in early 2007. Petla moved in with Olson a couple weeks after they began dating. In May 2007, and again in October 2007, Petla received hospital treatment after Olson assaulted her. After the October 2007 incident, Petla's family convinced her to seek treatment for her alcoholism. Petla entered an in-patient treatment program, and she graduated from that program on January 18, 2008.

Around 5:00 in the afternoon on the day after she left the treatment program, Petla met up with Olson at Olson's sister-in-law's house. They drank beer together, and then, around 9:00 p.m., Petla and Olson went to Olson's house.

Olson and Petla sat in Olson's kitchen, drinking more beer, and they began to argue. Eventually, Petla left the kitchen and went into the bedroom. Olson followed her into the bedroom, and they continued arguing. According to Petla's testimony, Olson started to get "pushy", so Petla suggested that they go outside and have a cigarette.

After smoking her cigarette, Petla went into the bathroom. When she came out, Olson started yelling at her and calling her names. Using an open hand, Olson hit Petla "a couple times" on the left side of her face. These blows were forceful enough that Petla grabbed ahold of Olson's shirt to prevent herself from falling down. Olson responded by grabbing Petla's throat: according to Petla, Olson told her, "All I have to do is squeeze it" or "[All I have to do is] snap your neck."

After Olson said this, Petla punched Olson, and Olson let her go. Petla ran to the phone and called the police and her daughters. The police responded to the call, and Olson was arrested.

After this incident, Petla's jaw was in pain, and she was unable to chew. However, she did not immediately seek medical treatment for her jaw because she did not realize how serious her injury was.

Two days later, on January 22nd, Petla went to the hospital and was given Vicodin for the pain. Petla returned to the hospital on January 30th because "she was unable to open her mouth, [her jaw was] markedly tender, [and] she had pain with jaw motion and . . . opening and closing her mouth." At the hospital, Petla's jaw was x-rayed, and she was diagnosed with a fractured jaw.

---

1. *See* AS 11.41.200(a)(1).

2. *See* AS 11.41.210(a)(2).

The type of fracture that Petla suffered is not usually treated surgically because the location is inaccessible. However, Dr. Adele Megli, a dentist who treated Petla, decided to refer Petla to an oral surgeon because "[Petla's] fracture was more displaced than [she] had seen before." The oral surgeon determined that "this was not something that could be, or should be, treated with surgical intervention." Instead, Petla was instructed not to wear her dentures, and to "eat a very soft diet for a period of time." She was also given Tylenol with codeine to help manage the pain.

Because of her broken jaw, Petla suffered pain whenever she coughed, yawned, laughed, or even smiled, and she could not lift objects of even ten pounds because it hurt her to do so. At a follow-up appointment on February 21st (*i.e.*, one month after she was injured), Petla still had pain when she chewed, and she often awoke in the night because of pain in her jaw.

On March 7th, Petla was still having pain, although the severity of the pain had lessened. She was beginning to eat normal foods again, but her jaw was still tender and sensitive to pressure, and her mandible (*i.e.*, her lower jaw) deviated to the side, so that she could not open her mouth straight. By April 7th, Petla "was eating reasonably well"; she had "minimal discomfort", and she was "doing as well as could be expected."

The State charged Olson with first-degree assault under AS 11.41.200(a)(1) (*i.e.*, recklessly causing serious physical injury to Petla by means of a dangerous instrument), and with second-degree assault under AS 11.41.210(a)(2) (*i.e.*, recklessly causing serious physical injury to Petla, irrespective of whether a dangerous instrument was used).

At Olson's trial, after the State concluded its case, Olson's attorney made a motion for a judgement of acquittal on both the first- and second-degree assault charges. The defense attorney argued that the evidence failed to establish the crime of first-degree assault because there was no evidence that Olson had used his hand in such a manner as to constitute a "dangerous instrument". The defense attorney also argued that the evidence was insufficient to establish either first- or second-degree assault because there was no evidence that Petla's injury amounted to a "serious physical injury".

The trial judge, Superior Court Judge Fred Torrisi, denied the defense motion for a judgement of acquittal on the second-degree assault charge. However, he expressed concern as to whether the State had proved that Olson used a "dangerous instrument" when he assaulted Petla, and he therefore took the defense motion under advisement with respect to the first-degree assault charge.

The case was submitted to the jury, and the jury found Olson guilty of both charges.

After the jury rendered its verdict, Judge Torrisi granted the defense motion for a judgment of acquittal on the first-degree assault charge. Specifically, Judge Torrisi ruled that the State had failed to present sufficient evidence to establish that Olson had used a dangerous instrument when he slapped Petla:

> [F]air-minded persons in the exercise of reasonable judgment could not [conclude that] the evidence established beyond a reasonable doubt that a dangerous instrument was used by Mr. Olson.... While [Mr. Olson] acted recklessly in disregarding the risk that his blow might seriously injure Ms. Petla, the evidence [is insufficient to] establish that the defendant hit her with a stick, or the telephone, or even his fist. Accordingly, the motion for judgment of acquittal on [first-degree assault] is granted.

As a first felony offender convicted of second-degree assault, Olson was subject to a maximum sentence of 10 years' imprisonment, and he faced a presumptive range of 1 to 3 years' imprisonment.[3] Judge Torrisi found one aggravating factor: that Olson's criminal history included repeated instances of assaultive behavior.[4] (Olson had assault convictions in 1992, 1993, 1994, 1995, 1997, and 2001.)

---

**3.** *See* AS 11.41.210(b) and AS 12.55.125(d)(1).

**4.** *See* AS 12.55.155(c)(8).

Because of this aggravating factor, Judge Torrisi had the authority to impose a sentence above the presumptive range.[5] The judge sentenced Olson to 7 years' imprisonment with 3 years suspended—*i.e.*, 4 years to serve.

*The evidence presented at Olson's trial is not sufficient to support a conviction for first-degree assault*

We turn first to the State's contention that the evidence presented at Olson's trial was sufficient to establish that Olson used his hand as a "dangerous instrument", and that Judge Torrisi therefore should not have granted Olson a judgement of acquittal on this charge.

The term "dangerous instrument" is defined in AS 11.81.900(b)(15). For purposes of Olson's case, the pertinent portion of this definition is "anything that, under the circumstances in which it is used, ... is capable of causing death or serious physical injury".[6]

Because this statute speaks of "anything" that, under the circumstances, is "capable" of causing death or serious physical injury, one might infer that *whenever* one person strikes another person with their hand or foot, and death or serious physical injury ensues, the person who dealt the blow must have used their hand or foot as a "dangerous instrument".

But as this Court has explained, the statute does not use the phrase "capable of causing death or serious physical injury" in this retrospective sense. The fact that serious physical injury resulted from the defendant's actions does not answer the question of whether the defendant used an object (including the defendant's own hand or foot) as a "dangerous instrument". Rather, this question is answered by examining the consequences that were reasonably likely to ensue from the defendant's actions, given the type of object that the defendant used, and given the manner and circumstances in which the object was used.

■ The fact that death or serious physical injury *does* ensue from a blow struck with a hand or a foot is, of course, evidence that the hand or foot was used in a manner that would qualify it as a "dangerous instrument". But the fact that death or serious physical injury ensued is not, by itself, sufficient to establish the element of "dangerous instrument". *Konrad v. State*, 763 P.2d 1369, 1373–74 (Alaska App.1988); *see also Wettanen v. State*, 656 P.2d 1213, 1217 (Alaska App.1983) ("Every kick or blow [that] causes serious injury ... will not automatically be an assault with a dangerous instrument.").

Rather, as this Court explained in *Wettanen*, 656 P.2d at 1218, "the requirement of a dangerous instrument [requires the finder of fact] to shift the focus of [its] attention from the result ..., which in any given case may have been unforseeable to the defendant at the time the assault was committed, to the manner in which the assault was committed."

■ In assessing whether a hand or foot qualifies as a dangerous instrument under the facts of a particular case, the fact-finder must focus on the *manner* and the *circumstances* in which the hand or foot was used. *Konrad*, 763 P.2d at 1374. As we noted in *Konrad*, some of the key factors to consider are: (1) whether the hand or foot was used in a manner that was "inordinately violent" or "particularly calculated to inflict serious physical injury"; (2) whether the defendant had specialized training in using his hands or feet to inflict death or serious physical injury; and (3) whether, under the circumstances, the victim was particularly susceptible to death or serious physical injury from a blow by the defendant's hand or foot. *See id.* at 1375.

■ Turning to the facts of Olson's case, the evidence showed that Olson slapped or struck Petla a "couple times" with his open hand. There was no evidence that Olson was trying to break Petla's jaw, or that the slaps were "particularly calculated to inflict serious physical injury."

Olson obviously hit Petla hard enough to break her jaw with his open-handed slaps. But as we explained above, the question of

---

5. *See* AS 12.55.155(a).

6. AS 11.81.900(b)(15)(A).

whether Olson used his hand as a "dangerous instrument" does not turn on the results that ensued, but rather on the results that were reasonably likely to ensue—*i.e.* the *manner and circumstances* in which Olson used his hand.

In weighing this question, the jury was entitled to consider the fact that Petla suffered a broken jaw. But as a matter of law, the jury's ultimate conclusion as to whether Olson used his hand in a manner reasonably likely to inflict death or serious physical injury could not rest solely on the type of injury that Olson's blows produced.

Here, there was no evidence, apart from Petla's injury, to support the conclusion that Olson used his hand in a manner that was likely to inflict death or serious physical injury.

The State argues that it presented evidence "that Olson knew how to injure someone in the face." The evidence to which the State refers is Petla's testimony that, in the past, Olson had taught her some self-defense moves, including how to hit someone in the nose to disable them. However, Petla also testified that Olson never talked to her about hitting a person in a way that would break their bones. Thus, even though the testimony indicated that Olson had training in self-defense, it would be pure speculation to conclude that Olson had specialized knowledge of how to slap someone in the face in a manner that would break their bones or inflict other serious injury.

There was also very little evidence that Petla was particularly susceptible to suffering serious physical injury. It is true that Petla was petite (she was approximately 5'1" and weighed 115 pounds) and that she was intoxicated at the time. However, Petla had no difficulty walking or maintaining her balance, she was coherent and functional enough to fight back when Olson slapped her, and she ran to the telephone and called for help when he released her.

Olson's case is analogous to the facts presented in *Braswell v. State*, Alaska App. Memorandum Opinion No. 2157, 1991 WL 11650678 (February 6, 1991). The defendant in *Braswell* struck the victim on the side of her head, perforating her eardrum and causing serious physical injury (lasting damage to her hearing). *Id.* at *1–2. Despite the fact that Braswell inflicted serious physical injury on the victim with his hand, this Court concluded that there was "insufficient particularized evidence [to establish] that the manner in which [Braswell's] hand was used caused the serious physical injury"—because "[t]here [was] no evidence [of] anything more than a single blow to the head with a hand". *Id.* at *4.

The State argued in *Braswell* that, because the victim suffered serious physical injury, the trier of fact could reasonably infer that Braswell had used his hand in a manner likely to cause serious injury. But this Court rejected the State's argument: "[To] permit inferences of the *manner* in which the hand was used by relying solely on the injury produced is exactly what *Wettanen* and *Konrad* prohibit." *Ibid* (emphasis in the original).

For these reasons, we agree with Judge Torrisi that the evidence in this case was not sufficient to support a finding that Olson used his hand as a dangerous instrument. And, without proof that Olson used a dangerous instrument, it was improper to convict Olson of first-degree assault. Accordingly, we affirm Judge Torrisi's decision to grant Olson a judgement of acquittal on the first-degree assault charge.

*The evidence was sufficient to support Olson's conviction for second-degree assault*

We next turn to Olson's contention that he should receive a judgement of acquittal on the second-degree assault charge—*i.e.,* his contention that the evidence presented at his trial was not sufficient to establish that Petla suffered "serious physical injury".

For purposes of Olson's case, the pertinent definition of "serious physical injury" is any physical injury that causes "serious and protracted disfigurement, protracted impairment of health, [or] protracted loss or impairment of the function of a body member or organ". AS 11.81.900(b)(56).

■ Here, the evidence showed that Olson struck Petla and broke her jaw. One of the

doctors who treated Petla described her broken jaw as a "significant" fracture because her jaw was "very displaced". Another of the doctors who treated Petla testified that "[this] fracture was more displaced than [she] had seen before," and that the fracture would have been corrected with surgery but for the fact that it was in "a very inaccessible area".

This second doctor also stated that Petla's jaw would probably never be the same as it was before the incident. The doctor testified that "[she] wouldn't expect, with this kind of a fracture, that [Petla will] be able to open her mouth as wide as she used to, or [to] move [her jaw] from side to side [to the extent] she used to."

The evidence showed that, a month after the incident, Petla still had pain when she chewed, and that she often awoke at night because of the pain in her jaw. A month and a half after the incident, Petla was still having some pain. She experienced tenderness when she put pressure on her jaw, and her jaw "deviate[d] to the side"; in other words, she couldn't open her mouth straight anymore.

Petla testified that it was "a couple months" before she could eat a regular meal. Because she was unable to eat normally, she lost approximately 15 pounds (about one-eighth of her total body weight) while her jaw was healing. At the time of Olson's trial (over a year after the incident), Petla's jaw still ached when it was cold outside.

This evidence was sufficient to support a finding that Petla's injury caused "protracted impairment of [her] health" and/or "protracted loss or impairment of the function of a body member". See *Walker v. State*, 742 P.2d 790, 791 (Alaska App.1987), where this Court held that the victim suffered protracted impairment of the function of a body member when the victim's broken jaw prevented him from chewing food for six weeks.

Because of the severity and duration of Petla's injury, Judge Torrisi correctly denied Olson's motion for a judgment of acquittal on the second-degree assault charge.

*Olson's sentence is not clearly mistaken*

█ As we explained earlier in this opinion, Olson received a sentence of 7 years' imprisonment with 3 years suspended—*i.e.*, 4 years to serve—for the crime of second-degree assault. This sentence was considerably more severe than the applicable presumptive range (1 to 3 years' imprisonment), but Judge Torrisi found that Olson had a history of assaultive conduct—*i.e*, aggravating factor AS 12.55.155(c)(8)—and, as a consequence, the judge was authorized to exceed the presumptive range when he sentenced Olson.

Olson does not challenge Judge Torrisi's finding of aggravator (c)(8). (The record shows that Olson had assault convictions in 1992, 1993, 1994, 1995, 1997, and 2001.) However, Olson argues that his sentence is excessive because, according to Olson, neither his conduct nor the injury he inflicted on Petla is as serious as the conduct and injury found in typical second-degree assault cases.

At Olson's sentencing hearing, Judge Torrisi concluded that Olson's current offense was serious, but he also stated that he was giving significant weight to Olson's extensive history of prior assaults. Judge Torrisi noted that Olson had abused Petla several times, and that Olson also had several convictions for similar assaults on other victims. The judge concluded that "the most important thing [in sentencing Olson] is to protect [Petla] and others like her," and to "reaffirm[ ] community norms."

█ It is true, as Olson points out, that this Court has decided sentence appeals where defendants received sentences similar to Olson's even though their conduct was more egregious. However, as this Court explained in *Hurn v. State*, "affirmance of a sentence on appeal means only that we conclude the sentence is not excessive; it does not set a ceiling on sentences in similar cases, nor does it necessarily mean that we would not have affirmed a greater sentence in the appeal being litigated." 872 P.2d 189, 199–200 (Alaska App.1994).

Moreover, this Court has upheld sentences more severe than the applicable presumptive term or range in domestic violence cases

where the defendant had a "history of repeated serious violence against the same victim." *Pickard v. State,* 965 P.2d 755, 756–57 (Alaska App.1998) (upholding a sentence of 4 years to serve, plus another year suspended, for a first felony offender convicted of third-degree assault). We stated that, in such cases, a trial judge may properly emphasize "the sentencing goals of isolation, deterrence, and reaffirmation of societal norms rather than rehabilitation." *Id.* at 760.

Given the facts of the present case, and given Olson's history of assaults, Judge Torrisi was not clearly mistaken in sentencing Olson to 7 years' imprisonment with 3 years suspended.

*The assertion that the statutory definition of "dangerous instrument" is unconstitutionally vague*

 During the proceedings in the trial court, Judge Torrisi suggested that the first-degree assault statute might be unconstitutionally vague. When the judge's remarks are read in context, it appears that he was actually suggesting that the definition of "dangerous instrument" might be unconstitutionally vague—and that, as a result, there might be no intelligible distinction between second-degree assault under AS 11.41.210(a)(2) (reckless infliction of serious physical injury) and first-degree assault under AS 11.41.200(a)(1) (reckless infliction of serious physical injury by means of a dangerous instrument).

The parties have briefed this issue as if it were potentially presented in this appeal. But even though Judge Torrisi talked about this issue, he made no ruling on it. Thus, there is no ruling for us to review. Moreover, we are affirming Judge Torrisi's decision to acquit Olson of first-degree assault. Consequently, the question of whether the definition of "dangerous instrument" is unconstitutionally vague is moot in Olson's case.

For both of these reasons, we decline to take up the issue of the purported unlawful vagueness in the statutory definition of "dangerous instrument".

*Conclusion*

The superior court's decision to grant Olson a judgement of acquittal on the charge of first-degree assault is AFFIRMED. Olson's conviction for second-degree assault, and the sentence he received for that crime, are AFFIRMED.